# WHITE AND WHITE *v.* KING

[No. 450, September Term, 1965.]

*Decided November 11, 1966.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Joseph F. McBride,* with whom were *Bill L. Yoho, Robert S. Hoyert, Roy W. Hooten* and *Hoyert & Yoho* on the brief, for appellants.

*Martin H. Freeman*, with whom were *Jerrold V. Powers* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

The appellants, Mr. and Mrs. Robert B. White, a husband and wife residing in Prince George's County, Maryland, sued the appellee, a resident of the same county, in the Circuit Court for Prince George's County, for injuries sustained in Michigan, when the appellee, who was driving the automobile in which the appellants were riding, apparently fell asleep at the wheel. The trial court, at the close of the appellants' case, granted a directed verdict for the appellee, on the grounds that the law of Michigan governed, that the appellants were guests of the appellee, as a matter of law, within the meaning of the Michigan Guest Statute, and that, under that statute, there was not sufficient evidence of the appellee's gross negligence or wilful and wanton misconduct to go to the jury.

The Michigan Guest Statute provides in part as follows:

"That no person, transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought." Mich. Stat. Ann. § 9.2101 (1960).

On this appeal the appellants contend, first, that this Court has not directly held that the *lex loci delicti* is controlling and that, in a case such as this, the law of Maryland should apply; second, that if the Michigan law does apply, the question of whether the appellants were passengers for hire rather than guests should have been submitted to the jury; and third, on the same assumption, that the lower court erred in not submit-

ting to the jury the issue of whether the accident was caused by the appellee's gross negligence.

I

This Court has consistently followed the rule that when an accident occurs in another state substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place. *Mroz v. Vasold, Jr.,* 228 Md. 81, 178 A. 2d 403 (1962) ; *Doughty v. Prettyman,* 219 Md. 83, 148 A. 2d 438 (1959). See also *Tobin v. Hoffman,* 202 Md. 382, 96 A. 2d 597 (1953) and *Wilson v. Dailey,* 191 Md. 472, 62 A. 2d 284 (1948). In *Mroz and Doughty,* both of which involved guest statutes of other states, the rationale of the rule was not questioned, but the decisions turned on its application. The rule was, and still is, followed by the great majority of other states. *Annot.,* "Choice of law in application of automobile guest statutes," 95 A.L.R.2d 12 (1964) ; Restatement, *Conflict of Laws* §§ 378, 384.

*Lex loci delicti* has been criticized by eminent authorities on the conflict of laws. A new rule has been proposed in Restatement, Second, *Conflict of Laws* § 379 (Tent. Draft No. 9, 1964), and the suggested new rule or modifications thereof have been adopted by highly respected courts in several state jurisdictions. *Babcock v. Jackson,* 12 N. Y. 2d 473, 240 N. Y. S. 2d 743, 191 N. E. 2d 279 (1963) ; *Johnson v. Johnson,* 107 N. H. 30, 216 A. 2d 781 (1966) ; *Wilcox v. Wilcox,* 26 Wis. 2d 617, 133 N. W. 2d 408 (1965). See also *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A. 2d 796 (1964). The new approach is that the local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort.

The gravamen of the new rule is set forth in *Babcock,* at 12 N. Y. 2d 481-82, as follows:

"The 'center of gravity' or 'grouping of contacts' doctrine adopted by this court in conflicts cases involving contracts impresses us as likewise affording the appropriate approach for accommodating the competing interests in tort cases with multi-State contacts.

Justice, fairness and 'the best practical result' * * * may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that 'it gives to the place "having the most interest in the problem" paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation." ' "

In *Wilcox*, at 26 Wis. 2d 629-30, the reason for the change is given in these words:

"All of the commentators and all of the cases that end up in disagreement with the unbending application of *lex loci* have a common thread that runs through the skein of rationale, and that thread is that the place of the occurrence of an unintentional tort is fortuitous, and it is by mere happenstance that the *lex loci* state is concerned at all. The most-dramatic instance of this type of fortuitousness is the case where an airplane is forced off its course and crashes in a state or country that was not on its route.

"They are also dismayed that in this day of rapid transportation, whether by land or air, the rights and liabilities of the parties as to each other should vary from hour-to-hour, or indeed minute-to-minute, as state boundaries are crossed. In the case before us the parties, husband and wife, passed through a number of states on their vacation. There appears to be no reason why the duty of the host to the guest should vary on the basis of factors that are not in anywise related to the public policy of the state most intimately concerned or associated with a changed relationship between the parties."

The reasons for the retention of the old rule, absent a change

by the Legislature, are set forth by the Delaware Supreme Court, in *Friday v. Smoot,* 211 A. 2d 594 (Del. 1965), as follows:

"The new test requires a court to determine which state has the more significant relationship with the tort and the parties, and to apply the substantive law of that state. In making this decision the important contacts to determine the question are the place of injury, the place of negligence, the domicile of the parties, and the place where the relationship of the parties is centered. The result is to substitute for a rule which was easy of application one where all manner of gradations of important contacts may be present.

\* \* \*

"We think we may not depart by judicial fiat from a rule settled in this state to adopt a 'flexible approach' which must be made certain by future litigation \* \* \* We suppose this is not the function of a court in the face of an established rule of law which would discourage such a result. We think the adoption of the more significant relationship theory would be a major change with respect to the rights of litigants. As such, therefore, it falls within the peculiar province of the General Assembly. It is the law-making body of this State—not the courts."

For illuminative comments on both sides of the question, see *Comments on Babcock v. Jackson, a Recent Development in Conflict of Laws,* 63 Colum.L.Rev. 1212 (1963); Note, *The Impact of Babcock v. Jackson on Conflict of Laws,* 52 Va.L. Rev. 302 (1966); Note, *Wilcox v. Wilcox: The Beginning of a New Approach to Conflict of Laws in Tort Cases,* 1966 Wis. L.Rev. 913; Note, 77 Harv.L.Rev. 355 (1963); and authorities therein cited.

The doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life.[1] While it is important, in our legal sys-

---

1. Lord Gardiner, Lord Chancellor of England, has recently announced that the decision of the House of Lords, in effect for more

tem, that persons should know the probable consequences of their acts, that consideration has little bearing on the commission of unintentional torts. These general principles, however, do not constrain us to find that *lex loci delicti* should be overruled.

In several of the jurisdictions which have discarded *lex loci delicti*, the rule which is to take its place seems still in the process of development. See *Dym v. Gordon*, 16 N. Y. 2d 120, 262 N. Y. S. 2d 463, 209 N. E. 2d 792 (1965) and *Dow v. Larrabee*, 107 N. H. 70, 217 A. 2d 506 (1966) and the dissents therein. Draft No. 9 of the Restatement on Conflicts is still tentative. It is characteristic of our legal system that the emergence of a new doctrine depends for its clarification on case-to-case decisions, as its application to different factual situations presents new difficulties to be resolved and new factors to be weighed. As this Court said in *Cole v. State*, 212 Md. 55, 58, 128 A. 2d 437 (1957), in connection with a proposal to change the *M'Naghten* insanity rule in criminal cases, unless and until what we deem a sound, practical alternative is evolved, we believe that any change should be made by the Legislature rather than by the courts.

In what we have said, we do not intend any implication that *lex loci delicti* is, in general, in our opinion, an unjust rule. Hardship may result in a particular case, but that, unfortunately, is true under any general legal principle. Certainty in the law is not so common that, where it exists, it is to be lightly discarded. We recognize the force of the countervailing arguments, but in the present state of the law, we leave any change in the established doctrine to the Legislature.

For these reasons, we hold that the Michigan law governs this case.

## II

The journey which ended in misfortune had its inception in sadness. On the day before the accident, the appellants learned that a sister of Mr. White had died in Grand Rapids, Michi-

---

than sixty years, that it had no power to alter its own past decisions, has been changed. Lord Gardiner said that hereafter, the Law Lords will "depart from a previous decision when it appears right to do so." N. Y. Times, July 31, 1966, § E. p. 6.

gan. The Whites, the appellee and his wife and other relatives met at the home of a sister of Mr. White in Parkland, Maryland. Mrs. King, the wife of the appellee, is also a sister of Mr. White. The Whites were informed by the Kings that they, the Whites, were to go to Michigan with the Kings. Mrs. Laura White, the 89 year old mother of Mr. White and Mrs. King, was to go in the same car. The Kings thought the five should be in Grand Rapids before the rest of the family to make the necessary funeral arrangements. Before this family meeting, Mr. King had anticipated going to Michigan with one of his sons.

Mr. White testified as to the arrangements which were made for the trip. It is axiomatic that, in reviewing the granting of a motion for a directed verdict, the testimony must be regarded in the light most favorable to the party against whom the verdict is asked, and we view the testimony in that light. A new air-conditioned car for the trip was being lent, without charge, to Mr. King by his employer, Mr. Pohanka of Pohanka Oldsmobile Service. According to Mr. White, the Whites and Mr. King agreed that the four would share the expenses of the journey, as had been done on other trips, and the driving would be divided between Mr. White and Mr. King. Mrs. King kept a black book on the expenses, as she always did on the family excursions; the expenses were to be divided at the end of the trip. Mr. White drove the car for only a few hours during the journey of over 500 miles; he asked Mr. King repeatedly, during the trip, to be allowed to take the wheel thereafter but his requests were refused.

We agree with the trial court that on these facts, under the Michigan decisions, the appellants, as a matter of law, were guests and not passengers for hire. Under the Michigan decisions, as we read them, the test is whether the trip is based on a commercial arrangement, rather than on a social relationship. If the arrangements are based on friendship or personal relationship, the payment of a proportionate share of the expenses of operation does not make the issue of whether the injured person was a guest a question for the jury. *Shumaker v. Kline,* 333 Mich. 346, 53 N. W. 2d 295 (1952); *Bushouse v. Brom,* 297 Mich. 616, 298 N. W. 303 (1941) and cases

therein cited. Nor does the sharing of driving by a guest passenger alter his legal status to that of a passenger for hire. *In re Harper's Estate,* 294 Mich. 453, 293 N. W. 715 (1940).

The cases relied upon by the appellants, in our opinion, do not bring them within the passenger-for-hire status under the Michigan law or make the issue one for the jury. *McGuire v. Armstrong,* 268 Mich. 152, 255 N. W. 745 (1934), affirmed a judgment for loss of services of the plaintiff's wife, who died as a result of personal injuries received while a passenger in the defendant's automobile. The defendant was a county nurse and the deceased, who was being treated for cataracts on her eyes, was being taken by the defendant to Grand Rapids to have glasses fitted. The deceased had made four previous trips with the defendant for treatment of her eyes; neither the deceased nor her husband was paying for the treatments or transportation. There was testimony that it was the defendant's duty as a county nurse to bring patients from various clinics to Grand Rapids and that transportation was furnished by the county for that purpose. The court held under these facts the deceased was not a guest. In *Collins v. Rydman,* 344 Mich. 588, 74 N. W. 2d 900 (1956), the plaintiff, the defendant's decedent and four other men had been riding together for approximately three months in a car pool. All six men were employed by the same company; each owned an automobile and under the agreement each member drove his automobile in turn every sixth day. It was held that the issue of whether or not the plaintiff was a passenger for hire or a guest passenger at the time of the accident was properly submitted to the jury. In *Pence v. Deaton,* 354 Mich. 547, 93 N. W. 2d 246 (1958), it was held that the question of whether the plaintiff was a passenger for hire in the defendant's automobile at the time of the accident should have been submitted to the jury when there was testimony that the plaintiff had paid the defendant $5 a week to drive him to and from work and had paid him $2.50 for the 24 mile trip involved, which was for the plaintiff's personal business. *Leebove v. Rovin,* 363 Mich. 569, 111 N. W. 2d 104 (1961), involved the application of the Guest Statute of Indiana. None of these cases is apposite to the situation here presented.

In *Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 162,

215 A. 2d 812 (1966), we expressed our regret that, unlike the federal courts, we cannot refer a question of law to the state where it originated. That lament is again applicable. However, it is our duty to apply the Michigan Guest Statute to the facts in this case, and we find that, under the Michigan law, the rule of *Shumaker, Bushouse* and *Harper's Estate* is applicable. The presence of the appellants in the appellee's car was the result solely of a personal and social relationship, not of a business arrangement. The combination of the agreements as to the sharing of the expenses and of the driving did not make the appellants passengers for hire. The trip was not a business expedition, but a personal one; that its occasion was death rather than pleasure did not convert it into a transportation for a business purpose. Nor did the fact that the car did not belong to the appellee alter the status of the parties; the guest status does not depend on whether the host is bearing the cost of wear on tires and other items of incidental expense. The nature of the expedition is determinative, and, under the Michigan law, the journey was for social and personal purposes of the appellants and the appellee.

### III

The testimony pertaining to the issue of whether or not the accident was the result of the appellee's gross negligence, as a matter of law, viewed in the light most favorable to the appellants, is as follows: The night prior to the journey, the appellee did not go to bed until after 11 P.M.; he was up by 7:15 A.M. He worked at his place of employment that morning and then arrived at the appellants' apartment at 10:30 A.M. and packed the automobile. The appellee spent about 45 minutes repairing the car's battery. The day was hot, with a temperature in the high 80's or low 90's. The trip began about 2 P.M. and continued until about 7:30 P.M. when there was a stop for rest and food. The appellee had driven during this entire period and continued to drive after the trip had been resumed until there was a stop for gasoline in Ohio, when the appellant, Mr. White, took the wheel for a period of approximately 2½ hours. The appellee then took the wheel again, although Mr. White told him that he, Mr. King, was still too tired to drive and had not had any rest and Mrs. White stated to Mrs. King

that Mr. King was too tired to drive. The attendant at the gaso-
line station told the party that it was 190 miles to Grand Rapids,
their destination, and Mr. White told Mr. King that if Mr.
King were to drive he should drive the first half and Mr. White
the last half, because the appellee was too tired to drive.

When the car, driven by the appellee, was entering Jackson,
Michigan, it went off the road onto the dirt beside the shoulder.
Mr. White again asked Mr. King if he did not think he, Mr.
White, should drive and the appellee said, "No. I will drive."
When the automobile was going through Lansing, Michigan,
it appeared to Mr. White that Mr. King was tired and Mr.
White again suggested to the appellee several times that he,
Mr. White, should drive, pointing out that the appellee had gone
over 100 miles since the stop for gasoline. The appellee refused,
saying that he could still drive. Coming out of Lansing, the
appellee had to apply his brakes and come to a complete stop
to avoid running into an overpass. Mr. White again asked Mr.
King if Mr. King wanted him to assist in driving and again
the appellee refused. The appellee said, "Well, we are almost
there. I've got it made." As the car was passing the airport at
Lansing, Mr. White again asked the appellee if he would let
Mr. White assist him in driving and again the appellee said
that he was capable of driving. The appellee said, "We are al-
most there. I've got it made now." In Lansing, Mr. White no-
ticed that Mr. King was not driving in his normal way. He re-
acted toward various traffic signals in a different manner than
he normally did on other occasions when the parties had driven
together.

At approximately 2:30 in the morning, the car driven by the
appellee left the road, travelled about 160 feet in the median
area and struck a dirt and concrete crossover, causing extensive
damage to the front and under part of the automobile and in-
juring all of the occupants of the car. The accident occurred
on a limited access highway. There was no indication that the
brakes had been applied and a reasonable, if not inescapable,
inference is that the appellee had gone to sleep at the wheel.
Prior to the accident, the appellee was driving with the windows
of the car closed and its air-conditioner and radio off. The dis-
tance from the College Park area, where the trip began, to

Grand Rapids is about 648 miles. Over 500 miles of the journey had been completed and the appellee had driven the entire way except for the 2½ hours during which Mr. White was at the wheel.

That the accident was the result of the appellee's negligence is not contested. The question before us is whether, under the Michigan decisions, the court below was correct in holding, as a matter of law, that the appellee was not guilty of gross negligence or wilful and wanton misconduct.

What constitutes gross negligence is generally to be determined on the consideration of all the facts in the particular case. In determining whether a defendant was grossly negligent under the Michigan Guest Statute, as a matter of law, the Supreme Court of Michigan looks to the sum total of all the factors involved. *McKenzie v. McKenzie,* 374 Mich. 320, 132 N. W. 2d 73, 74-75 (1965) ; *Brooks v. Haack,* 374 Mich. 261, 132 N. W. 2d 13, 15 (1965) and cases therein cited. The Michigan court has decided several cases under the Guest Statute turning on the question of whether the driver of the automobile, who was overcome by sleep, was guilty of gross negligence as a matter of law, and several of these cases involve some of the circumstances present in this case. However, we have been referred to no Michigan case and have found none holding that on the total of such facts as are here presented the question of gross negligence was not a proper one for determination by the jury.

In *Manser v. Eder,* 263 Mich. 107, 248 N. W. 563 (1933), a judgment for the plaintiff, a guest passenger, was affirmed when there had been only one prior warning as to the defendant's sleepy condition and the plaintiff had asked to be let out of the car. In *Boos v. Sauer,* 266 Mich. 230, 234, 253 N. W. 278 (1934), in which a judgment for the defendant *n.o.v.* was affirmed, the defendant had only slept four or five hours the night before the accident, but the plaintiff had given no prior warning as to the defendant's condition. The court said: "The testimony falls short of indicating that Sauer had such prewarning of a likelihood to go to sleep that his continuance to drive was an act of intentional wrong or recklessness as to consequences." In *Wismer v. Marx,* 289 Mich. 38, 41, 286 N.

W. 149 (1939), the court said: "We have held that the driver of an automobile, overcome by sleep, is not guilty of gross negligence or wilful and wanton misconduct unless he continues to drive in reckless disregard of premonitory symptoms." A judgment for the plaintiff was reversed. In that case, however, there had been only one prior warning as to the defendant's sleepiness and the plaintiff acquiesced in the defendant's continued driving. A judgment for the defendant *n.o.v.* was affirmed in *Butine v. Stevens*, 319 Mich. 176, 29 N. W. 2d 325 (1947). In that case, the court held that the plaintiff had not shown that the defendant continued to drive in reckless disregard of premonitory symptoms.

The testimony in the present case, viewed most favorably for the appellants, contains a number of factors which, in combination, were not present in any of the Michigan cases. These factors include the numerous warnings as to the appellee's sleepiness given by the appellant, Mr. White, and the appellee's continued refusal to relinquish the wheel to Mr. White; the long time and the substantial distance the appellee had been driving; his driving off the road a fairly short time before the accident and, later, his near collision with an overpass; the appellee's strenuous activities prior to the beginning of the journey, including his working at his employment in the morning before the trip began, and then his work on the automobile on a hot day; the fact that the accident occurred on a limited access highway, on which the jury could reasonably have inferred, under the circumstances, that the tendency to sleep was accentuated; and the appellee's driving of the automobile, despite the prior warnings and near-accidents, with the windows closed and without turning on the air-conditioner with which the car was equipped.

On this combination of circumstances, we should have no hesitation, as a matter of Maryland law,[2] in holding that

---

2. In this State we have considered what does or does not constitute gross negligence in a number of cases arising under the criminal law dealing with manslaughter by automobile. Under those cases in which, of course, the State must prove the defendant's guilt beyond a reasonable doubt, the test is whether the conduct of the defendant was such as to amount to "a wanton or reckless disre-

whether the appellee was grossly negligent was a question for the determination of the jury. We find no Michigan case which indicates that the Michigan law as applied to these facts is to the contrary. The appellee's insistence on continuing his driving, in view of the prior incidents, Mr. White's repeated requests to take the wheel, and all the other circumstances may well have been considered by a jury to constitute a reckless disregard of premonitory symptoms. The totality of the evidence, under the Michigan law, as we read it, was sufficient for the jury to find that the appellee should have known that, if he continued to drive, he would, in all probability, be overcome by sleep, and that under the circumstances, his conduct amounted to a wanton neglect of the safety of all the occupants of the car. It is true that Mr. White did not in terms insist or demand that he be given the wheel, but the jury could have found as a reasonable inference from the testimony that suggestions rather than demands were better calculated to accomplish the desired result. There was testimony that Mr. White was sleeping and had not asked to drive for about 25 miles prior to the accident. However the jury could reasonably have found that this was not acquiescence in Mr. King's operation of the car but that further requests to drive would have been futile and that Mr. White was resting so that he would be refreshed if called upon to drive. The repeated suggestions made by Mr. White strongly indicated not only a lack of acquiescence but also protests and well-founded fears.

The question before us is not whether the appellee was guilty of gross negligence as a matter of law but only whether under the Michigan law and decisions the trial court was in error in not submitting the question to the jury for its determination under proper instructions. We hold that under the Michigan law the issue should have been submitted to the jury.

*Judgment reversed; case remanded for a new trial in accordance with the above opinion; costs to be paid by the appellee.*

---

gard for human life or for the rights of others." Johnson v. State, 213 Md. 527, 531, 132 A. 2d 853 (1957) and cases therein cited. See also State v. Chapman, 101 F. Supp. 335, 341 (D. Md. 1951).