# JOYCE MARCINE WILLIAMSON *v.* STATE OF MARYLAND

[No. 777, September Term, 1976.]

*Decided June 10, 1977.*

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*Alfred L. Scanlan, Jr., Assigned Public Defender,* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Sandra O'Connor, State's Attorney for Baltimore County,* and *Dana Mark Levitz, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court. LOWE, J., dissents and filed a dissenting opinion at page 412 *infra.*

In the Circuit Court for Baltimore County, a jury, presided over by Judge Kenneth C. Proctor, convicted Joyce Marcine Williamson, the appellant, of murder (count one), conspiracy to murder (count two), and solicitation of murder (count three). She was sentenced to life imprisonment for murder and to a concurrent five year term for the merged offenses of conspiracy and solicitation. On appeal, the appellant contends that: a) the evidence was insufficient to sustain her conviction for murder; b) the trial court abused its discretion in sentencing her to life imprisonment for murder; and c) the trial court committed prejudicial error by denying her motion for a bifurcated trial on the issues of sanity and guilt.

I

Maryland recognizes the common law distinction between principals and accessories before the fact.[1] One charged as a principal cannot be convicted on evidence sufficient to show that he was an accessory but insufficient to show that he was a principal.[2] Persons who themselves commit the crime,

---

1. McBryde and Bland v. State, 30 Md. App. 357, 359, 352 A. 2d 324, 326 (1976); Agresti v. State, 2 Md. App. 278, 281, 234 A. 2d 284, 286 (1967).
2. McBryde and Bland, *supra,* 30 Md. App. at 360, 352 A. 2d at 327; Huff v. State, 23 Md. App. 211, 214, 326 A. 2d 198, 201, *cert. denied,* 273 Md. 721 (1975).

either by their own hand or by the hand of an innocent agent, are principals in the first degree. Persons who are present, either actually or constructively, and who aid and abet the commission of the crime but do not themselves commit it, are principals in the second degree, provided there is a guilty principal in the first degree. Persons who procure, counsel or command the perpetrator, but who are not present, actually or constructively, at such perpetration, are accessories before the fact.[3] Thus, the critical difference between a principal and an accessory before the fact is presence or absence during the commission of the crime.[4]

Here, in order to sustain the appellant's conviction, the State was required to prove that the appellant herself committed the murder or was either actually or constructively present when the crime was committed. The appellant contends that there was no evidence to show that she committed the murder or was actually or constructively present at the time it was committed. The State concedes that there was no evidence to show that the appellant committed the murder or that she was actually present during its commission. It argues, however, that the close physical proximity of the appellant to the murder scene, coupled with other evidence that the appellant, in pursuance of a common design, was so situated as to be able to aid the murderer, establishes that she was constructively present. We do not agree.

This Court has repeatedly delineated the characteristics of constructive presence.[5] In *Huff, supra,*[6] this Court said:

"A person is constructively present, hence guilty as a principal, if he is acting with the person who actually commits the deed in pursuance of a common design, and is aiding his associate, either by keeping watch or otherwise, or is so situated as to be able to aid him, with

---

3. Agresti, *supra,* 2 Md. App. at 280, 234 A. 2d at 285.
4. McBryde and Bland, *supra,* 30 Md. App. at 359, 352 A. 2d at 326; Huff, *supra,* 23 Md. App. at 214, 326 A. 2d at 201.
5. McBryde and Bland, *supra,* 30 Md. App. at 360, 352 A. 2d at 326; Huff, *supra,* 23 Md. App. at 215, 326 A. 2d at 201; Sanders v. State, 1 Md. App. 630, 646, 232 A. 2d 555, 564 (1967).
6. 23 Md. App. at 215, 326 A. 2d at 201.

a view, known to the other, to insure success in the accomplishment of the common enterprise."

Here, there was evidence to show that the appellant, her husband Randolph Alexander Williamson, Jr., her brother Nelson Leroy Boone, and her sister Renee Boone lived in the same house. Beginning in January, 1975, the appellant, with the help of her brother, attempted to hire someone to kill her husband. During negotiations with someone who ultimately refused to commit the murder, the appellant's brother, in describing a suggested mode of operation, said: "He would get the person drunk . . . and the guy would be in the car and it would be no problem."

In July or August, 1975, the appellant, again with the help of her brother, hired Lawrence Merrick to kill her husband. On the Saturday before Labor Day, her brother drove Merrick to a club near the appellant's home, where he left him, and then returned home. About 11:30 that night, the brother left the house to make a trip to North Carolina. He saw Merrick "sitting down in one of my [Boone's] cars parked outside of my sister's house." The husband was asleep in one of his own cars which was then parked in the driveway near the same house. The brother drove off but shortly after his departure he stopped and called his sister. He asked whether she knew what she was doing and "what had gotten into her." She told him to "have a nice trip." He returned home and took the husband into the house. He then had another conversation with his sister in which "she told me just to mind my business, and we got into a few words."

Subsequently, at about 12:30 a.m., on 5 October 1975, the appellant and her husband returned from a party. Her husband was intoxicated and asleep in the car. As she had frequently done in the past under similar circumstances, she parked the car in their driveway and went into their house, leaving her husband asleep in the car. At about 2:15 a.m., the appellant's sister returned to the house and noticed that the appellant's husband was asleep in the car. At about 2:30 a.m., the appellant's brother returned to the house. The appellant called to him and then he went to bed. Later, he was awakened by a telephone call from Merrick who asked

what he was doing. The brother said he was "sleeping," and the conversation ended. Shortly before 4 a.m., the appellant woke her brother. She told him that she had heard her husband calling her and asked him to help carry her husband inside. When she got outside, she found her husband lying in a pool of blood next to the car. She began to scream. The police arrived. The appellant was taken to a police station where she gave an exculpatory statement.

There was no evidence to show that on the night of the murder the appellant helped the murderer in any way. There was nothing to show that she encouraged her husband to drink so that he would fall asleep in the car. Neither was there evidence to show that she signalled the murderer to come and commit the murder, nor that the murderer ever contacted her in the house. Finally, there was nothing to show that she was awake at the time of the murder or that, if awake, she could see the murder site.

In the absence of such evidence, the fact that the appellant had contact with Merrick before the crime was committed, even when coupled with the fact that she was physically close to the murder site, does not show or support a rational inference that at the time the murder was committed the appellant helped or was so situated as to be able to help the murderer. Consequently, the evidence was insufficient to show the appellant's constructive presence at the time of the commission of the crime. Accordingly, it was insufficient to show that she was a principal in her husband's murder and to sustain her conviction for that murder. We shall reverse.[7]

## II

The appellant contends that the denial of a bifurcated trial on the issues of sanity and guilt violated her right against self-incrimination.[8] She maintains that her insanity plea by its very nature constituted an admission of complicity in the crime. She further points out that in order to establish her

---

7. In view of this decision, the appellant's contention with respect to her sentencing for murder need not be considered.

8. MD. CONST. Dec. of Rights art. 22.

insanity defense, she was required to produce psychiatric testimony containing statements she had made to her psychiatrist which tended to implicate her in the commission of the crime. She concludes that the single trial procedure is constitutionally infirm because it compels her to place such incriminatory evidence before a jury which decides not only the question of sanity, but also the question of innocence or guilt.

While it has been held that such a procedure does not violate due process or equal protection of the law,[9] the issue of whether a single trial on the questions of guilt and sanity violates the right against self-incrimination has not previously been determined. Analogous situations have been considered.

In *Bartholomey v. State*,[10] a statute authorized a jury in a first degree murder case to prevent the imposition of the death sentence by adding the words "without capital punishment" to its verdict. It was there contended that a single verdict procedure which required an accused to make an election between testifying in order to mitigate the severity of his punishment or not testifying in order to avoid establishing his own guilt had a chilling effect on the exercise of his privilege against self-incrimination. The Court of Appeals said:[11]

> "In the present case, although no plea of guilty was involved, the appellant was presented with a tactical choice of exercising his undoubted right not to testify or to testify and subject himself to cross-examination by the State. We have never understood that the constitutional right against self-incrimination permits a defendant who elects to testify in his own behalf to confine his testimony to evidence he believes to be favorable to him but

---

**9.** Tull v. State, 230 Md. 596, 601, 188 A. 2d 150, 153 (1963); Avey v. State, 9 Md. App. 227, 230, 263 A. 2d 609, 611, *cert. denied*, 258 Md. 725 (1970); Sweeney v. State, 6 Md. App. 431, 439, 252 A. 2d 9, 14 (1969).

**10.** 260 Md. 504, 273 A. 2d 164 (1971), *mod.*, 408 U. S. 938, 92 S. Ct. 2870 (1972).

**11.** Bartholomey, *supra*, 260 Md. at 526-27, 273 A. 2d at 176.

precludes the jury from hearing evidence which may be unfavorable to him."

The court then held that the single verdict procedure did not violate the accused's right against self-incrimination.

In *Bremer v. State*,[12] the accused, having entered the defense of insanity, was ordered to submit to a mental examination by the State. It was there contended that this order violated his right against self-incrimination because the single trial procedure would cause his incriminatory statements, made to the State psychiatrists with respect to the question of sanity, to be disclosed to a jury deciding the question of innocence or guilt. This Court said:[13]

"Where [an accused] has pleaded insanity as a defense and presented evidence to meet the threshold question, the maintenance of a 'fair state-individual balance' requires that the State be permitted to have him examined.

. . .

"Not only was the mental examination to determine Bremer's sanity *vel non* required to maintain a 'fair state-individual balance,' but it follows that if the State must 'shoulder the entire load' of establishing sanity beyond a reasonable doubt, it must have the means to do so at its disposal. The State should not have to rely on examinations made only by experts chosen by Bremer, leaving it with recourse only to cross-examination of them, or to its selected experts whose testimony would be predicated upon courtroom observations and hypothetical questions. Nor do we deem the purpose and result of the examination of Bremer by the staff at Perkins to be 'the cruel, simple expedient of compelling [incriminating evidence] from his own mouth.' The

---

12. 18 Md. App. 291, 307 A. 2d 503, *cert. denied*, 269 Md. 755 (1973), *cert. denied*, 415 U. S. 930 (1974).
13. Bremer, *supra*, 18 Md. App. at 316-18, 307 A. 2d at 519-20.

purpose of the examination was to determine whether Bremer possessed the requisite mental capacity, in the face of his plea that he did not, to be criminally responsible for the criminal acts charged, upon proper proof that he did do them." (Citations omitted.)

The court concluded that the accused's right against self-incrimination was not violated by requiring him to elect between cooperating with the State's psychiatrist in order to preserve his voluntarily interposed insanity defense, and not cooperating with the State's psychiatrist in order to avoid having his own statements used to establish guilt.

Applying these principles to the instant case produces a clear result. The accused here voluntarily elected to present the defense of insanity. She voluntarily elected to present psychiatric testimony which contained incriminatory statements. Unlike Bremer, she was not compelled to submit to a mental examination. The right against self-incrimination does not permit the appellant to confine her testimony to evidence which she believes to be favorable to her, or to preclude the jury from hearing evidence which may be unfavorable to her. The single trial procedure, although it requires the appellant to elect between presenting evidence to show insanity or not presenting such evidence in order to avoid establishing her own guilt, does not violate her right against self-incrimination.

> *Judgment as to count one reversed.*
> *Judgments as to counts two and three affirmed.*
> *Costs to be paid by Baltimore County.*

*Lowe, J., dissenting:*

" 'This distinguishing of the accessory before the fact from the principal is a pure technicality. It has no existence either in natural reason or the ordinary doctrines of the law. For in natural reason

the procurer of a crime is not chargeable differently from the doer; and a familiar rule of the common law is that what one does through another's agency is regarded as done by himself. Even the common law of crimes makes no distinction in the punishment between a principal and an accessory, — the offence of each being a felony, of which the penalty was originally death. Likewise in morals, there are circumstances wherein we attach more blame to the accessory before the fact than to his principal; as, where a husband commands his wife or a master his servant to do for his benefit a criminal thing which, in his absence, is done reluctantly through fear or affection overpowering a subject mind.' " 1 Bishop, *Criminal Law*, 9th ed., § 673, as quoted in *Watson v. State*, 208 Md. 210, 218.

It is hardly conceivable that in the 20th Century, a court of last resort could so clearly recognize the utter purposelessness of so horrendously harmful a semantic distinction, yet must still recognize its viability. Worse yet is the fact that more than two decades have passed since this "pure technicality . . . [which] has no existence either in natural reason or the ordinary doctrines of the law . . ." was held up to ridicule in that case, and the Legislature has done nothing to correct it.[1] Nor did our own attempt at flagging this fictional foolishness in *Agresti v. State*, 2 Md App. 278, 281, elicit a statutory erasure of that common law blot upon jurisdictional reasoning, as has been accomplished in many, if not most common law jurisdictions. See 40 Am. Jur. 2d, *Homicide* §§ 28, 29; 21 Am. Jur. 2d, *Criminal Law* §§ 120-124; 22 C.J.S. *Criminal Law*, § 82; see also 95 A.L.R.2d 175, 178, 187.

This has caused us factually to distinguish and interpretatively whittle away at the rule, but such intellectual exercises hardly do justice to the judicial system. Because it was not the legislative branch but the common

---

1. *But cf.* Md. Code, Art. 27, § 6.

law judicial system that created the technical monster, I would no longer await the action of a Legislature which may well be too occupied with matters of state to clean up the jurisprudential cobwebs we have accumulated. The common law is a growing thing and when it outgrows old garments not only of no further use but of potential harm, they should be discarded.

Although we are bound by the opinions of the Court of Appeals and the rule of *stare decisis*, that Court is not:

" 'The doctrine of *stare decisis*, important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life,' *White v. King*, 244 Md. 348, 354, 223 A. 2d 763 (1966)." *Hearst Corp. v. St. Dep't of A. & T.*, 269 Md. 625, 643-644.

There could be no case which cries out more for the obliteration of that distinction than the case at bar. The failure to do so gives rise to the hypothesis that a syndicate operator who hires his killings by a "hit man" while he lolls in the tropics, is not a "principal" involved in the murders that he has ordered, bought and paid for. The more practical difficulty may arise even upon retrial, where witnesses and evidence may no longer be available; or worse, where, as here, a retrial may not be available because the defendant has been found, on appeal, not guilty as a principal, and was not charged as an accessory. It is a fundamentally unfair to permit such traps to be laid for prosecutors as it would be to have them set for an accused. The concept of fair play which we recognize as a basic tenet of Anglo-American jurisprudence, *Glickfield v. State*, 203 Md. 400, 403, is not reserved solely for the accused. Society should share in it equally.

As to this case, while it offends me to be compelled factually to circumlocute an obstacle that should not exist, I find that both this Court and the Court of Appeals have done so in cases which strain far more than we would need in this case. In the past, we have strained to reverse, *McBryde and*

*Bland v. State*, 30 Md. App. 357, as well as to affirm, *Huff v. State*, 23 Md. App. 211.

While we have held that a "principal differs from an accessory before the fact only in the requirement of presence", *Huff v. State, supra*, 23 Md. App. at 215, and it is upon this distinction that the case before us now turns, the Court of Appeals has on at least one occasion not admitted to such a difference. In *Vincent v. State*, 220 Md. 232, 239, the Court said:

> "It has long been held that whoever aids and abets the actual commission of a felony by some degree of assistance or encouragement, *whether present at the place of perpetration or not,* is a principal in the second degree." (footnote omitted, emphasis added).

This case is one of only four cases cited in C.J.S. for the proposition that a principal in the second degree is one who aids and abets the commission of a crime "by some degree of assistance or encouragement, whether or not present at the place of perpetration." C.J.S. *Criminal Law* § 85. It may very well be that the Court of Appeals has already taken the first step to obliterate the artificial distinction between a principal and an accessory before the fact. Even in *Watson, supra,* the presence or absence distinction is not recognized by the definition set forth at 217.

> "An accessory before the fact is one who aids or abets the principal offender *before or at* the time of the commission of the crime." (emphasis added).

Assuming, however, that this was oversight in *Watson* and in *Vincent* (since *Vincent* did not discuss whether the defendant could have been an accessory before the fact instead of a principal), we note that the defendant there was held to be a principal in the second degree to armed robbery upon facts showing that he sat in the getaway car parked an unspecified distance, in an alley, from the gas station, he did not drive the car or plan the robbery, his job was to have a change of shirts ready for his confederates, to watch out for police, traffic signals and road conditions so that

the group would stay within the traffic laws and not be picked up, to have the getaway car "ready", and that his share of the loot was $5.00. There was no showing that he saw or could see the robbery from where he sat, or that he was to drive the vehicle to escape, but the Court said:

> "While he was not actually present at the immediate place of the perpetration of the robbery, he was in close proximity and contiguity thereto rendering aid and assistance to those who were personally performing the hold up." 220 Md. at 239.

No elaboration is needed to show that the complicity of Mrs. Williamson in this case was greater than Vincent's, and that, awake or asleep,[2] it can be rationally inferred that she was so situated as to be able to assist Merrick.

In *Butina v. State*, 4 Md. App. 312, defendant argued that he was an accessry before the fact, not a principal in the second degree. He was held the latter upon evidence which showed that he was the driver of the car whose occupants purchased a can of gasoline the night of the fire, that a similar car was seen at the scene of the arson, that he protested when he heard of the planned burning and was told to stop the car near the scene of the crime because the perpetrators had to go to the bathroom, that he saw a big flash when the building ignited, and that he drove the perpetrators away. Although, as gleaned from the opinion, there was no evidence that Butina actually watched his fellows set the fire, or indeed could even see them (as opposed to the house) as they set the fire, the Court stated as fact the inference that he was in " 'close proximity or contiguity' in a position to assist if necessary or to watch or prevent interference or detection or to encourage the commission of the crime at the moment of its commission . . . ." The Court, in accepting this inference, obviously used the evidence which tended to show that appellant knew there would be a burning long before he said he was told of

---

2. Although, as pointed out by the majority, "there is nothing to show that she was awake at the time of the murder", we also note that there was nothing to show she was asleep either.

the plan, to infer that he would be willing or able to help. The inference in the case before us is not a fraction harder to sustain in view of appellant's hiring of Merrick.

In *Huff, supra*, the defendant also claimed that he was an accessory before the fact rather than a principal in the second degree. The evidence showed that appellant and Corkran had known each other at least three weeks before the robbery, were seen together the evening before the robbery, and soon before the robbery, that appellant hailed a cab which double-parked before the bank as Corkran went in to rob it, and that he silently accepted a portion of the proceeds in the cab as it left the scene. The jury was allowed to use appellant's prior association with Corkran in particular places and on particular occasions, and appellant's silent acceptance of a share of the proceeds, to explain the nature of his presence at the scene, *i.e.*, his intent in hailing the cab and waiting outside the bank. Quoting from *Foster v. State*, 11 Md. App. 40, *rev'd on other grounds, State v. Foster*, 263 Md. 388, this Court in *Huff* explained that the relation of the accused to the crime is for the jury to decide. *Id.* at 215. Thus, while the facts in *Huff* showing presence are somewhat stronger than in the case we here consider, the proximity of Huff to the scene was given a great deal of mileage on the basis of inferences taken from surrounding facts.

Finally, in *McBryde, supra*, it was held that defendants were principals in the second degree instead of accessories before the fact upon evidence that they were in a car which cased a store and, at a signal from a third party who had originally been in the car with them, drove the car into a nearby alley. Appellants could not see the store from their location, but it was inferred from the fact that appellants left the motor running that they were so situated as to be able to aid the actual robber:

> "The state argues that because the appellants' automobile was parked out of sight of the 7-Eleven store the appellants were not constructively present. This reads the definition of constructive presence too narrowly. The test is not whether the

appellants could see the 7-Eleven store, but whether they were acting in concert with McLaughlan in furtherance of a common scheme and were so situated as to aid McLaughlan in his escape." *Id.* at 360.[3]

This factual conclusion resulted in a reversal of the convictions as accessories before the fact, on the theory that a defendant cannot be convicted as an accessory upon facts showing he is a principal.

In this case it can certainly be inferred, from: the fact that appellant hired Merrick; the fact that appellant was only a few yards in space from the murder scene; the fact that appellant left the intoxicated victim in a vulnerable position; and the fact that appellant obviously knew of the impending murder attempt in July or August (a month before the actual murder) as evidenced by her two conversations with her brother on that night in which she effectively told him to mind his own business; that appellant was so situated as to be *able* to aid Merrick.

If semantics are needed, one who hires an agent or employee is that agent's principal, but call her what you will — principal or accessory — appellant was as guilty of murder as he whom she hired to do the deed. I could not let a semantic distinction with no foundation of reason or purpose so hamstring society. Justice and fair play, procedural or substantive, should be jealously adhered to — but for society to be compelled to carry the expense of retrying this woman on the same facts, subjecting her to the same punishment, again providing her with a public defender, and undoubtedly another appeal, for what is precisely the same crime by a different epithet, is ridiculous. Worse yet if she cannot be retried. We begin to understand Mr. Bumble's view of the law.

---

**3.** This logically follows, for the test is *ability* to help. Presence is not to be determined by mere contiguity of space. Wharton, *Criminal Law and Procedure* § 107.