ARTHUR HERMAN BREMER *v.* STATE OF MARYLAND

[No. 583, September Term, 1972.]

*Decided July 6, 1973.*

292

294

296

The cause was argued before ORTH, C. J., and THOMPSON and MENCHINE, JJ.

*Benjamin Lipsitz*, with whom was *Eleanor Jean Lipsitz* on the brief, for appellant.

*Gary Melick, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Edward F. Borgerding, Assistant Attorney General, Chief, Criminal Division, Arthur A. Marshall, Jr., State's Attorney for Prince George's County*, and *Elias Silverstein, Deputy State's Attorney for Prince George's County*, on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

ARTHUR HERMAN BREMER does not claim that the evidence adduced at his trial before a jury in the Circuit Court for Prince George's County was not sufficient to sustain the convictions returned against him.[1] There was no

---

*Note: *Certiorari* denied, Court of Appeals of Maryland, October 1, 1973.

1. The Grand Jury for Prince George's County returned four indictments against Bremer, each charging crimes committed on 15 May 1972. The indictments were consolidated for trial, which began on 31 July 1972 under the general issue plea of not guilty and the special plea that Bremer was insane at the time of the commission of the alleged crimes. The jury rendered its verdicts on 4 August. Under the special plea the jury found that Bremer was sane at the time of the commission of the crimes. He was

call for that contention because clearly the evidence was sufficient in law to establish that he carried a handgun on his person, and that he used it in the commission of crimes of violence, assaulting four persons with intent to murder. George Corley Wallace, the Governor of Alabama; Nick Zarvos, a Special Agent of the United States Secret Service; Edred Cole Dothard, a member of the Alabama State Police; and Dora Thompson, a campaign worker for the Governor, were shot. The shootings occurred at the Laurel Shopping Center in Prince George's County at a Wallace Rally. The catastasis of the incident was when Governor Wallace finished his speech, descended from the speaker's platform

---

convicted of the following crimes and sentences were imposed as designated:

Criminal Trials 12,376:

> 2nd count — assaulting George Corley Wallace with intent to murder — 15 years from 15 May 1972;
> 5th count—carrying a handgun on his person—3 years consecutive to the sentence under the 2nd count;
> 6th count — using a handgun in the commission of a crime of violence — 15 years consecutive to the sentence under the 5th count.

Criminal Trials 12,377:

> 2nd count — assaulting Edred Cole Dothard with intent to murder — 10 years consecutive to the sentences imposed in 12,376;
> 6th count — using a handgun in the commission of a crime of violence — 10 years concurrent with the sentence under the 2nd count.

Criminal Trials 12,378:

> 2nd count — assaulting Nick Zarvos with intent to murder — 10 years consecutive to the sentence imposed in 12,377;
> 6th count — using a handgun in the commission of a crime of violence — 10 years concurrent with the sentence under the 2nd count.

Criminal Trials 12,379:

> 2nd count — assaulting Dora Thompson with intent to murder — 10 years consecutive with the sentence imposed in 12,378; .
> 6th count — using a handgun in the commission of a crime of violence — 10 years concurrent with the sentence under the 2nd count.

The total time to be served was 63 years. Upon application for review of sentence the review panel, by order of 29 September 1972, as to Criminal Trials 12,376 reduced the sentence under each of the 2nd and 6th counts to 10 years, otherwise confirming the sentences as imposed. Therefore, the total time to be served under the sentences as now constituted is 53 years.

and walked among the crowd shaking hands. As he was greeting the spectators, he and Zarvos and Dothard and Mrs. Thompson were shot. Evidence adduced by the testimony of the victims, except Governor Wallace, by physicians who treated them, and by several eyewitnesses was legally sufficient to prove the corpus delicti of each crime.[2] See *Mahoney v. State*, 13 Md. App. 105. The testimony of two

---

**2.** Dr. Joseph Schanno described Governor Wallace's injuries:

"There was a through and through bullet wound in the right forearm; there was a through and through bullet wound in the left — correction — in the right upper arm; there was a superficial through and through bullet wound entering on the lateral aspect of the right shoulder and a point of exit over the upper part of the breast, just by the armpit; there was a grazing abrasion of the skin consistent with a missile wound behind the right shoulder blade; there was a point of entry of a wound on the lower anterior right chest; there was a point of entry of a bullet wound on the lateral side of the thorax about in the mid position, thorax or chest, slightly posterior to the back.

These were the immediate injuries that we saw. He was also paralyzed from the hips down without any muscle power or sensation."

Zarvos testified:

"I had a 38 bullet enter the lower throat area, here, went across paralyzing my right vocal cord and entering lodged in the jawbone, fractured the jawbone and I have nerve damage to the lower lip area. There is no feeling and I lost four or five teeth."

Dr. Richard Longoria treated Dothard. The Doctor said:

"He had a superficial wound of the abdominal wall with some irritation surrounding it, that was about three or four, two inches in diameter." He said the abdominal wall was located on the lower ribs.

Dr. Peter James removed a bullet from the left leg of Mrs. Thompson and reduced a fracture that had been caused by the bullet wound. He enclosed the wound and put on a cast. "Mrs. Thompson's wound was located in the mid-portion of her calf at the back of her calf and there was a wound of entry where the bullet had gone in right in the middle of the muscle. The skin, of course, was broken around this area for a distance of approximately a half inch in circumference, and the skin was damaged around this area as well. * * * The bullet, of course, stayed in the leg. * * * The posterior tibial artery is there, and its accompanying posterior tibial nerves that are there, the muscles that make up the Achilles tendon are there. The nerves and arteries and veins were not damaged. The muscles were quite extensively damaged and required a considerable amount of removal of dead muscle to clean the area completely and prevent infection. Of course, the bone was shattered and that was the main surgery."

eyewitnesses who made a positive judicial identification of Bremer as the person who fired the shots, and evidence tending to show that the bullets causing the injuries were fired from a handgun which was in Bremer's possession, were legally enough to establish Bremer's criminal agency. *Honest v. State*, 5 Md. App. 480. The trial court did not err in denying Bremer's motion for judgment of acquittal made at the close of all the evidence. *Williams v. State*, 5 Md. App. 450.

Bremer urges that the convictions be reversed, not because he is innocent of the wrongdoing of which he was found guilty, but because the convictions were improperly come by. It is a fundamental tenet of our system of justice that a person is presumed to be innocent until he is proved to be guilty. When a defendant is found guilty, his conviction must be properly obtained upon due regard for his substantive rights and fair observance of appropriate procedural rules. We explained this in *McKinney v. Director*, 18 Md. App. 50.

> "Contrary to views expressed at times by those who may not understand them, laws and rules governing procedures in our system of administration of justice are far from being mere 'technicalities'. Such laws and rules constitute the flesh which fills out the skeleton made up of our substantive rights and responsibilities. Without procedures for invoking or enforcing those substantive rights and responsibilities, they would be bare indeed. A right without the means of enforcing it is an empty right.
>
> In a society governed by laws and not by men, the laws and rules of procedure must be clearly expressed, and must be carefully followed. The alternative would lead to uncertainty at the least, and perhaps to chaos. Rights which are found only in the books, with no clear means of vindicating them in the courts, have little more than academic significance.

We are fully aware that there are times when the application of a procedural rule may appear to frustrate rather than to promote justice. But it is basic in our system of organized society that the greatest good for the greatest number is best accomplished by the uniform application of both substantive and procedural laws and rules which are sufficiently certain that a member of that society may know his rights, and how to assert or protect them."

Bremer presents, as he has every right to do, a spate of reasons why the convictions against him should not stand. Some are procedural; some go to substance; some claim denial of constitutional rights; some assert violation of statutory prescriptions; all allege prejudicial error on the part of the trial court in refusing matters proposed by him or in permitting matters opposed by him. He contends the trial court erred:

    I. in not abating or staying the trial;
   II. in not dismissing the indictments;
  III. in not rescinding its order for a mental examination of him;
  IV. in not allowing challenge to the array of jurors;
   V. in not granting proposed voir dire questions;
  VI. in not permitting more than four peremptory challenges;
 VII. in not excluding testimony;

    (1) concerning his sanity adduced from a doctor who "acknowledged that he did not know the Maryland test";
    (2) concerning communications made by him to certain doctors;
    (3) concerning his sanity because it was admitted during the guilt stage of the proceedings;

VIII. in its instructions to the jury;

IX. in imposing separate sentences under the 2nd
and 6th counts of each indictment;

X. in certain of its rulings on the evidence.

After affording them careful consideration, we affirm the judgments. We give our reasons.

## I

On 14 June 1972 Bremer filed a motion to abate or stay the proceedings until "(a) a federal criminal prosecution presently pending against him has been concluded; (b) federal authorities who now have him in custody have surrendered him to appropriate Prince George's County authorities and (c) the effects upon potential jurors of publicity relating to him and to the matters with which he is sought to be charged herein have been dissipated sufficiently to enable him to obtain a fair and impartial jury in this Court."

The motion came on for hearing on 21 June. After Bremer adduced some evidence through the testimony of the manager of the city home delivery of the Washington Post, it was agreed that the hearing on the motion would be continued to enable the State and defense to prepare a stipulation and submit tangible evidence. On 28 June Bremer offered various newspapers and excerpts from newspapers and magazines. After the court had examined the evidence, it denied the motion. On appeal Bremer says that the denial was prejudicial error, and in support thereof relies only on that reason in the motion concerning the publicity as derogating from a fair trial.

In ruling on the motion the trial judge observed that the exhibits indicated that immediately after the date on which Bremer was charged "there was considerable publicity about four different people being shot in a shopping center in Laurel." He said:

"It's rather interesting to note that the publicity that was particularly called to the Court's attention was that in a magazine section of the Washington Post, which was seven

days later, and in the next edition following the episode of Time Magazine, Newsweek and Life Magazine. Of course, all of that publicity was on a national basis and is not concentrated in any way in this area.

There was for the first few days considerable publicity in all of the news media. Interestingly enough, not very much in the local county weekly papers. There is no daily paper published in Prince George's County but the Washington and Baltimore papers, and undoubtedly very much the same news was published in newspapers all over the United States. I guess even other places beyond the limits of the United States.

The test here or the decision involves balancing a number of different factors. One is that a person accused of a crime not only is entitled to a speedy trial, but the authorities administering the system should be interested in bringing about speedy trials, and the public has a definite interest in speedy trials. There is nothing unusual about setting this kind of a case this length of time. I think counsel for the defendant would be compelled to concede readily a trial date that was set here is not unduly early or unduly speedy.

In addition to that, of course, there are cases that by their very nature they generate publicity and they generate discussion, and that can't be avoided. When one of those kind of cases comes up, there is more coverage by the news media, there is more public interest, there is obviously more publicity, but that is just something that occurs by the very nature of things, and the Court isn't responsible for that, and we have to balance that with the question that perhaps you can say if the trial was delayed one year there would not be quite as much publicity and people who had read — prospective jurors who had read something about it might have forgotten about it, or the idea would be dim in their minds,

but six months it wouldn't be quite as dim, and if you waited two years it would be dimmer in their minds, and might possibly make an argument to continue one of these kinds of cases for several years. But you have to balance that with other interests, and the final test comes as to whether or not the kind of publicity and the nature of the case and the circumstances are such, weighing the public interest and getting cases over with and disposed of, and innocent people freed and guilty people dealt with, balancing that out with the questions of delay, and then testing the whole question of whether or not the nature of the publicity has been sufficiently prejudicial or prejudicial to a degree that it would deny the defendant due process.

The classic case in this area is Sheppard versus Maxwell [384 U. S. 333 (1966)] which has been cited by both sides, and has even been mentioned in an earlier ruling in this very case, but there the case was of particular local interest because it involved a prominent local citizen who was accused of murdering his wife. There was a great deal of publicity. Apparently the case created such interest that correspondents from all over the country came there for the trial. Almost constantly in that case the prosecutor was making statements about what witnesses he would be calling, and the defense attorney was making statements to the press and being interviewed. They had a complete list of the prospective jurors and they were being interviewed. Witnesses were being interviewed. A coroner's inquest was on live television and televised over the entire area. Newspaper editorials were demanding an arrest and making assertions of the defendant's guilt. Then at the trial itself the greater proportion of the entire courtroom was set out for the press, and they were inside the rail and literally breathing down the backs of counsel and the defendant, and

picking up exhibits and looking at them during the course of the trial, and it was even impossible for the defendant to confer with his attorney in the area where he was; he had to go off and seek some kind of seclusion.

The Supreme Court held there that the totality of the circumstances were such that the defendant had not received a fair trial, it was not due process, and that he was entitled to another trial. This was some twelve years later after the conviction. It doesn't seem to me we are confronted with that. I did not find in looking over the various clippings and various articles, nor was anything called to my specific attention, that demanded a conviction, that stated anything actually about the trial itself or said anything about the witnesses' who would testify. There were no statements by either of the prosecuting attorney or the defense attorney, and there were no editorials. It seems to me the circumstances of the case are such that there would bound to be more than, much more than, the usual amount of publicity, but, on the other hand, it does not seem to me that that would prevent the defendant from having a fair trial, though the jury will be carefully instructed in any trial that takes place concerning the full protection of the defendant concerning any publicity; that voir dire questions will be permitted to protect the defendant.

I therefore conclude under all of the circumstances nothing has occurred which will jeopardize the defendant's right to a fair trial or deny him due process, and that the motion to abate or stay proceedings will be denied."

We see no abuse of judicial discretion in the denial of the motion to abate or continue the proceedings as on our independent constitutional appraisal we find as did the trial court that Bremer's right to a trial by an impartial jury or to due process of law was not denied. See *Bryant v. State,* 207

Md. 565. On the circumstances of this case, the doctrines of *Estes v. Texas*, 381 U. S. 532, *Turner v. Louisiana*, 379 U. S. 466, and *Rideau v. Louisiana*, 373 U. S. 723, do not apply. Cf. *Groppi v. Wisconsin*, 400 U. S. 505. We particularly note the answers to the *voir dire* questions as discussed in Part V hereof.

As we have indicated, the keystone of criminal justice as administered under our system is the presumption of innocence. When the People accuse a person of conduct prohibited in the interest of society as a whole, that person stands trial before his peers cloaked in the presumption and armed with the constitutional guarantees conferred upon him. The People must prove his guilt for him to be convicted. The measure of proof is beyond a reasonable doubt and the manner of proof is by a fair and impartial trial. No trial is fair and impartial which unduly encroaches upon the constitutional rights of the individual. Individual rights, however, must be weighed against the rights of the People. For society as a whole, no less than the individual member of it, has rights, and the fine balance between them must be maintained.

Although the individual accused of crime has the right to a fair and impartial trial, the People have the right to know the facts concerning matters which affect them, and neither widespread and diverse methods of communicating such facts nor public knowledge of them necessarily derogates from a fair and impartial trial. When the nature of misconduct is such that extensive publicity is sure to follow, and, particularly, when a motivation for the misconduct is the inevitable publicity, it would be ironic indeed were the miscreant to escape punishment because of that publicity. No person has a constitutional right *per se* not to be tried upon a charge duly made that he committed a crime. For a trial to be precluded or long delayed because of the sheer enormity of the offense would result in anarchy and anomie. The right to a fair trial and the right of a free press must be balanced, but with the realization that there is no war between the constitution and common sense.

## II

On 14 June 1972 Bremer filed a motion to dismiss the indictments. He assigns as reasons: (1) all of the counts are unconstitutionally vague; (2) Code, Art. 27, § 36 B (b), a violation of which was charged by the 5th count of indictment 12,376, and § 36 B (d), a violation of which was charged by the 6th count of each indictment are unconstitutional; (3) Code, Art. 27, § 36 B (d) is invalid because it lends itself to the imposition of double punishment for the same act; (4) the 6th count of each indictment merged into the 2nd count thereof.

### (1)

Bremer broadly argues that none of the counts charges an offense. He complains because they do not allege facts. He gives only three specifics: (i) "the assault with intent to murder counts do not even allege, for instance, that each supposed assault was accomplished by shooting (the alleged victim) with a gun"; (ii) "nor do they in any way specify the manner or means which the State claims Bremer employed to carry out the alleged offenses"; (iii) "the handgun counts do not identify the weapon sought to be referred to in any manner, even as being a pistol". He concludes that the counts "thus fail to inform [him] of the accusations sought to be made against him and are thus fatally defective." We do not agree.

It is well settled that an indictment is sufficient if it informs the person charged of the acccusation against him as required by Article 21 of the Maryland Declaration of Rights, and if the charge is made with sufficient definiteness to enable him to prepare his defense and to prevent the accused from being charged again with the same offense in a future prosecution. *Byrd v. State,* 16 Md. App. 391, 396-400; *Mason v. State,* 12 Md. App. 655, 677, and cases therein cited.[3] The indictment is generally held to be sufficient if it

---

**3.** Discussing the niceties required in drawing indictments, Sir Matthew Hale, Knt., some time Lord Chief Justice of the Court of King's Bench of

follows substantially the language of the statute proscribing the crime alleged or charges the offense in equivalent words or others of the same import if the defendant is thereby fully informed of the particular offense charged, and the court is enabled to see therefrom on what statute the charge is founded. *Beasley v. State*, 17 Md. App. 7, 11, quoting *Baker v. State*, 6 Md. App. 148, 157.

The 2nd count of each indictment sets out the date the alleged offense was committed, describes the offense as a felonious assault on a named person with intent feloniously, wilfully and of malice aforethought to murder that person and states that this is "contrary to the form of the Act of Assembly in such cases made and provided and against the peace, government and dignity of the State." Code, Art. 27, § 12 prescribes that "every person convicted of the crime of assault with intent to murder shall be guilty of a felony" and designates the sentence. The statute does not attempt to define the elements, but it has been long established that it is necessary that there be proof of an assault, and that it was with an intent to murder, that is, had death ensued the homicide would have constituted murder. Therefore, it embodies the element of malice. *Woodard v. State*, 13 Md. App. 114, 121-124; *Simms v. State*, 4 Md. App. 160, 168. The challenged counts as drawn include the elements of assault, intent to murder, and malice. Clearly the crime of assault with intent to murder is charged, and it was set out with sufficient specificity to enable Bremer to prepare his defense and to prevent him from being charged again with the same

---

England, said in his *The History of the Pleas of the Crown* (1st American ed. 1847) vol. II, ch. XXIII, p. 193:

"That in favour of life great strictnesses have been in all times required in points of indictments, and the truth is, that it is grown to be a blemish and inconvenience in the law, and the administration thereof; more offenders escape by the over easy ear given to exceptions in indictments, than by their own innocence, and many times gross murders, burglaries, robberies, and other heinous and crying offenses, escape by these unseemly niceties to the reproach of the law, to the shame of the government, and to the encouragement of villany, and to the dishonour of God. And it were very fit, that by some law this over-grown curiosity and nicety were reformed, which is now become the disease of the law, and will I fear in time grow mortal without some timely remedy."

offense in a future prosecution. How the assault was accomplished and other details of the commission of the offense were for the *probata*, not the *allegata*. See Rule 712 a. "The means of effecting the criminal intent, or the circumstances evincive of the *quo animo*, with which the act was done, are considered to be more properly matters of evidence for the jury to demonstrate the intent, than proper to be incorporated into the indictment . . . ." *State v. Dent*, 3 Gill & Johnson 8, 10. See *State v. Falkenham*, 73 Md. 463, 468; *Hollohan v. State*, 32 Md. 399, 401. We hold that the counts charging assault with intent to murder were not unconstitutionally vague.

The 5th count of indictment 12,376 presented that on 15 May 1972 Bremer "did unlawfully carry a handgun on or about his person in violation of Article 27, Section 36 B (b), and against the peace, government and dignity of the State." The statute designated reads in pertinent part:

> "Any person who shall . . . carry . . . any handgun, whether concealed or open, upon or about his person . . . shall be guilty of a misdemeanor . . . ."

The count follows substantially the language of the statute and is thus sufficiently definite. Moreover, Bremer demanded and was granted particulars as to this count. The answer to the demand identified the handgun as "One Carter Arms 38 cal., 5-shot revolver, model, undercover, Serial #104347" and stated that Bremer carried the handgun "on or about his person on May 15, 1972 in Laurel, Prince George's County, Maryland," which the State intended to show by eyewitnesses. Rule 715. Bremer did not except to the answer to his demand. We hold that the 5th count of indictment 12,376 was not unconstitutionally vague.

The 6th count of the indictments presented that on 15 May 1972 Bremer "did unlawfully use a handgun in the commission of a crime of violence in violation of Article 27, Section 36 B (d) and against the peace, government and dignity of the State." The statute designated provides:

> "Any person who shall use a handgun in the

> commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor . . . ."

Section 441 defines "crime of violence" to mean certain designated crimes and "assault with intent to commit any other offense punishable by imprisonment for more than one year." Assault with intent to murder is a felony and the maximum sentence authorized is 15 years. The counts refer explicitly to the statute alleged to have been violated and are drawn substantially in the statutory language. We hold that the 6th count in each indictment is not unconstitutionally vague.

### (2)

Bremer urges that Code, Art. 27, § 36B is unconstitutional because the title of Chapter 13, Acts 1972, which enacted the statutes "embraces more than one subject, *e.g.,* handguns, licenses and private detectives," and because the body of the Act "includes a subject matter not described in its title, viz, mandatory minimum sentences" without any requirement that the basis for exposure to such mandatory punishment be set out in an indictment.

Article III, § 29, Constitution of Maryland, provides that ". . . every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title; . . . ." Chapter 13, Acts 1972 is entitled as follows:

> "AN ACT to repeal and re-enact, with amendments, Section 36 of Article 27 of the Annotated Code of Maryland (1971 Replacement Volume), title 'Crimes and Punishments,' subtitle 'I. Crimes and Punishments,' subheading 'CARRYING OR WEARING WEAPON'; to repeal and re-enact, with amendments, Section 36A (c) of said Article and title of the said Annotated Code of Maryland (1971 Replacement Volume and 1971 Supplement), subtitle 'I. Crimes and Punishment,' subheading 'Carrying Deadly Weapons on Public School Property'; to add new Sections 36B, 36C, 36D,

36E, and 36F to Article 27 of the Annotated Code of
Maryland (1971 Replacement Volume and 1971
Supplement), title 'Crimes and Punishments,'
subtitle 'I. Crimes and Punishments,' to follow
immediately after Section 36A of said article, title
and subtitle, under the new subheading
'Handguns'; to repeal and re-enact, with
amendments, Section 594B (e) of Article 27 of the
Annotated Code of Maryland (1971 Replacement
Volume), title 'Crimes and Punishments,' subtitle
'II. Venue, Procedure and Sentence,' subheading
'Arrests;' to repeal Section 90A of Article 56 of the
Annotated Code of Maryland (1968 Replacement
Volume and 1971 Supplement), title 'Licenses,'
subtitle 'Private Detectives;' to exclude handguns
from the provisions of Section 36 of Article 27; to
amend the penalties for carrying a handgun on
public school property; to make unlawful, generally
regulate, and provide penalties for the wearing,
carrying, or transporting of handguns; TO MAKE
UNLAWFUL THE WEARING, CARRYING, OR
TRANSPORTING OF HANDGUNS BY A
PERSON WITH A PERMIT WHILE HE IS
UNDER THE INFLUENCE OF ALCOHOL OR
DRUGS AND TO PROVIDE PENALTIES
THEREFOR; to make the use of a handgun in the
commission of a felony or crime of violence a
misdemeanor and to provide penalties therefor; to
allow law enforcement officers to conduct searches
for handguns under certain circumstances; to allow
law enforcement officers to arrest persons for
violating Section 36B of said article pursuant to the
provisions of Section 594B (e) of Article 27; to repeal
provisions for the issuance of permits to private
detectives to carry concealed weapons; TO
CORRECT CERTAIN OBSOLETE LANGUAGE
AND REFERENCES; TO PROVIDE FOR
SEIZURES, FORFEITURES AND PROCEDURES
RELATING THERETO; and relating generally
to the regulation of handguns."

In *Leonardo v. Board*, 214 Md. 287, the Court of Appeals noted:

"Section 29 of Article 3 of the Constitution has been involved in cases before this Court on numerous occasions. It has been included in the last three Constitutions of this State, and its purposes are to prevent the combination in one act of several distinct and incongruous subjects, and to inform the members of the legislature of the nature of the bills introduced, which are usually read to them by their titles only, and to permit the citizens of the State to know of proposed legislation. The general rule of its construction is that every presumption favors the validity of the statute, and reasonable doubt is enough to sustain it."

In testing conformity of a title to this constitutional requirement, there is enjoined upon the courts a disposition to uphold rather than to defeat the enactment. *Mayor & City Council v. Perrin*, 178 Md. 101; *Allied v. Commissioner*, 219 Md. 607. If several sections of the law refer to and are germane to the same subject matter, which is described in its title, it is considered as embracing but a single subject, and as satisfying the requirements of the Constitution in this respect. *Beshore v. Town of Bel Air*, 237 Md. 398; *Panitz v. Comptroller*, 247 Md. 501. The various sections of the Act, although addressing themselves to several related topics, are germane to a single subject, restrictions on the use and possession of "handguns." The title, therefore, is not at variance with the constitutional mandate.

As to Bremer's argument about the penalty, the title of the Act includes that the Act is to provide penalties for the use of a handgun in the commission of a felony or crime of violence. Further, we find that the mandate for the imposition of a minimum sentence set out in Code, Art. 27, § 36B (d) does not violate any guarantee in Article 21 of the Maryland Constitution.

## (3)

Code, Art. 27, § 36B (d), proscribing the use of a handgun in the commission of a felony or designated crime of violence, expressly provides that any person so using such weapon ". . . shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of the commission of said felony or misdemeanor, be sentenced to the Maryland Division of Correction for a term of not less than five nor more than fifteen years, and it is mandatory upon the court to impose no less than the minimum sentence of five years." The legislative intent is clear. The question is whether the statute is constitutional. We think it is. We see no violation of the double jeopardy clause of the fifth amendment to the federal constitution, *Benton v. Maryland*, 395 U. S. 784, 787, because the crime created by § 36B (d) is separate and distinct from the felony or crime of violence to which it relates. Thus there is no question of being twice put in jeopardy "for the same offense." See *William Cornelius Jones v. State*, 17 Md. App. 504.

Bremer suggests that the 6th count of each indictment merged into the 2nd count. The point is not properly raised in the frame of reference of its presentation. Bremer would have the 6th count dismissed on his pretrial motion. Merger could only occur upon conviction under each of the 2nd and 6th counts. The doctrine of merger provides no basis to dismiss the counts prior to conviction. See *Dorsey v. State*, 9 Md. App. 80, 87-88.[4]

### III

Bremer entered a special plea raising the defense of insanity.[5] On 28 June 1972 the trial court ordered that he be delivered to the custody of The Clifton T. Perkins State

---

**4.** For a discussion of merger *vel non* of the 6th count into the 2nd count of each indictment upon conviction, see IX *infra*.

**5.** For a discussion of the history of responsibility for criminal acts, see *Young v. State*, 14 Md. App. 538.

Hospital and that an examination of him be there made by the Department of Mental Hygiene for determination whether he was insane at the time of the commission of the alleged offenses and whether he was of such mental incapacity as to prevent him from properly conducting his defense. Bremer promptly filed a motion to strike or rescind the order for the mental examination of him. He claimed it deprived him of his right to remain silent and compelled or sought him to incriminate himself in violation of his constitutional rights. Upon hearing the same day, the motion was denied.

The contention as presented by Bremer is that the lower court erred in refusing to rescind its order for the mental examination. The order was pursuant to Code, Art. 59, § 25 (b), which gives the trial court, when a person interposes the defense of insanity, " . . . full power and authority to order an examination of the mental condition of such person by the Department of Mental Hygiene . . . ." There is a statutory privilege extended to patients[6] to refuse to disclose, and to prevent a witness from disclosing any communication, wherever made, relating to diagnosis or treatment of the patient's mental or emotional disorder. "This privilege applies to communications between patient and psychiatrist, between patient and certified psychologist, between a patient and other patients receiving diagnostic or treatment services in a formal group conducted by the psychiatrist or certified psychologist, or between members of the patient's family and the psychiatrist or certified psychologist, in the accomplishment of the objectives of diagnosis or treatment." Code, Art. 35, § 13A (b). But there is no privilege for any relevant communications "in all proceedings, whether civil or criminal, in which the patient introduces his mental condition as an element of his claim or defense . . . ." Code, Art. 35, § 13A (c) (3). It seems that

---

6. A patient is "a person who communicates regarding or receives services for the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, certified psychologist, or other persons participating directly and vitally with either in rendering such services in consultation with, or under the direct supervision and direction of a psychiatrist or psychologist . . . ." Code, Art. 35, § 13A (a).

Bremer urges that Code, Art. 59, § 25 (b), considered in the light of Code, Art. 35, § 13A (c) (3), is unconstitutional as applied to him. He argues: "If he elected to cooperate with State psychiatrists, he must accept a substantial risk of self-incrimination by making statements which would later be disclosed to a jury deciding his guilt or innocence. If, on the other hand, he chose to remain silent and refuse cooperation, he must gamble that he would not thereby severely damage his chances of succeeding in his insanity defense, or even lose an opportunity to establish it conclusively." He ties all this in to the single trial procedure in Maryland whereby the same jury determines both the defendant's criminal responsibility and his guilt or innocence. He claims that the denial of a bifurcated trial on the separate issues of insanity and guilt of the crime violates due process and equal protection of the laws.

We have held that a bifurcated trial on the separate issues of insanity and guilt of the crimes is not constitutionally mandated. *Sweeney v. State*, 6 Md. App. 431, 438-439. We adhere to that view. We pointed out in *White v. State*, 17 Md. App. 58, 61, that the plea of insanity is no more than the assertion of an affirmative defense. We said, in *Sweeney*, at 438, that such defense, once doubt has been raised as to sanity, see *Strawderman v. State*, 4 Md. App. 689, 698, is not determinable apart from the trial on the merits of guilt or innocence under the general issue plea, but is a matter for a finding at the trial by the trier of fact, be it court or jury. We saw no violation of due process then by such procedure and we see none now, nor do we believe that equal protection of the laws is thereby denied. On the contrary, we held in *Morris v. State*, 11 Md. App. 18, 25-26, that due process of law was denied where there was a finding of not guilty by reason of insanity at the time of the commission of the offense without the State producing evidence at the trial sufficient in law to establish the *corpus delicti* of the crime charged and the criminal agency of the accused.

When insanity is raised as a defense the procedure to be followed is firmly established. We laid it out in *Strawderman v. State*, *supra*, at 698:

> "So when a plea has been filed in writing alleging that the accused was insane at the time of the commission of the alleged crime, the court should determine preliminarily whether the proof adduced in support thereof is sufficient to raise a doubt as to the sanity of the accused, as defined, in the minds of reasonable men. If it finds that it is not, the State has no further burden with respect thereto and, in a jury trial, the question is not submitted to the jury. If the court finds that the proof adduced was sufficient to surmount the threshold question of doubt as to the accused's responsibility, the State has the burden of convincing the trier of facts that the accused was sane, and, in a jury trial, evidence on the issue should then be introduced before the jury with proper instructions."

We noted that in a jury trial such proof on the preliminary question should be presented out of the presence of the jury. *Id.*, note 7 at 698. But see *Mahoney v. State*, 8 Md. App. 44.

In the light of the established procedure, the propriety of the statutory power in the court to order an examination of the mental condition of a defendant is evident.[7] Where he has pleaded insanity as a defense and presented evidence to meet the threshold question, the maintenance of a "fair state-individual balance" requires that the State be permitted to have him examined. When he is indigent the State is required to provide him with an impartial and competent psychiatrist at the State's expense. *Skinner v. State*, 16 Md. App. 116, 123-124. This may be done by making available to the defendant the impartial and competent psychiatric staff at the Clifton T. Perkins State Hospital. *Brown v. State*, 14 Md. App. 415, 423; *Swanson v. State*, 9 Md. App. 594, 600-602.[8] In such circumstances we believe

---

7. It may be that a trial court has inherent power to require a psychiatric examination of a defendant in an appropriate case. See *United States v. Albright*, 388 F. 2d 719, 722-723 (4th Cir. 1968).

8. Although a defendant is not entitled to the services of an independent psychiatrist of his choice at State expense, he may, of course, employ one at his expense.

that a defendant's right against self-incrimination is not violated *per se* by requiring him to submit to a mental examination. The Supreme Court explained the right in *Miranda v. State of Arizona*, 384 U. S. 436, 460:

> "We have recently noted that the privilege against self-incrimination — the essential mainstay of our adversary system — is founded on a complex of values. . . . All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government — state or federal — must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. . . . In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " (case citations omitted)

Not only was the mental examination to determine Bremer's sanity *vel non* required to maintain a "fair state-individual balance," but it follows that if the State must "shoulder the entire load" of establishing sanity beyond a reasonable doubt, it must have the means to do so at its disposal. The State should not have to rely on examinations made only by experts chosen by Bremer, leaving it with recourse only to cross-examination of them, or to its selected experts whose testimony would be predicated upon courtroom observations and hypothetical questions.[9] Nor do we deem the purpose

---

9. An opinion by a layman on the matter of insanity is inadmissible. An opinion as to the ultimate fact, whether or not the accused is insane under the appropriate test, "in fairness both to the accused and the State, should

and result of the examination of Bremer by the staff at Perkins to be "the cruel, simple expedient of compelling [incriminating evidence] from his own mouth." The purpose of the examination was to determine whether Bremer possessed the requisite mental capacity, in the face of his plea that he did not, to be criminally responsible for the criminal acts charged, upon proper proof that he did do them. See *United States v. Albright, supra,* at 724-725.

We hold that at the time and in the circumstances of the presentation of the motion to rescind its order that Bremer be examined at The Clifton T. Perkins Hospital, the motion was properly denied.

## IV

Code, Art. 51, § 4 (b) (iv) prescribes that when the names of prospective jurors are drawn as designated, "Notwithstanding any other provision of law or this article, the name, address, age, sex, occupation, occupation of spouse, and education of each person" so drawn shall be made public, "unless the jury judge shall determine in any case that the interest of justice requires that this information shall remain confidential". Section 10 (a) provides:

> "In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this article in selecting the grand or petit jury."

Shortly before the voir dire examination began Bremer challenged the array of jurors and moved "for a stay pending production of a jury array or *venire facias* in accordance with Article 51." The challenge and motion were made on

be reached by a medical diagnosis. Thus the opinion must be made by a medically trained psychiatrist in order to be admissible in evidence." *Saul v. State,* 6 Md. App. 540, 549-550.

the ground that the education of each person drawn was not made public. It appears that the list of jurors for Prince George's County as made public in April, 1972, did not designate the "education" of the persons thereon, and although defense counsel did not obtain the list until some four days before the commencement of the trial, it was available to him before that time. In any event, it is clear that the educational information had been made available to defense counsel before the challenge and motion were made. The trial court denied the challenge and motion for that reason. The transcript reads:

> "THE COURT: I will deny that because you have made the point and it has been supplied to you.
> MR. LIPSITZ [Defense Counsel]: All right, Your Honor.
> THE COURT: The information is furnished on a questionnaire. And you have it on all the jurors.
> MR. LIPSITZ: I agree, I have it today. I am simply making the point for the record that the array is bad because of the failure of the Circuit Court for Prince George's County to include this information in the published list when the panels were drawn. . . ."

We see no prejudice to Bremer in the circumstances and hold that the trial court did not err in denying the challenge and motion.[10]

## V

Bremer proposed fifty-three voir dire questions. The trial court rejected them and asked eleven questions propounded by it. Bremer, although contending that "most of his questions were appropriate," urges that the failure to ask Nos. 21, 22 and 23, or similar ones specifically aimed at

---

10. We need not reach the point whether the failure to include information as to education when the list was published was such a "substantial failure to comply with the provisions" of Art. 51 as to invoke the sanction set out in § 10 (a). Nor need we decide whether the motion was made within seven days after Bremer could have discovered, by the exercise of diligence, the ground of his motion.

determining the juror's exposure to pretrial publicity and particularly to the CBS news film which subsequently became part of the State's evidence, was extremely harmful to him and vitiated his trial." [11]

The questions asked the jury by the court included whether the prospective juror had expressed or formed any opinion as to the guilt or innocence, or as to the sanity or insanity of Bremer.[12] The penultimate question (No. 10) was:

> "Have you read, seen, or heard anything about this case which would prevent you from rendering a fair and impartial verdict based solely on the evidence adduced in court during trial . . . as to the guilt or innocence of the defendant and secondly as to the defendant's sanity at the time of the commission of the alleged offense?"

The last question (No. 11) was:

> "Is there any reason why you would not be able to render a fair and impartial verdict in these cases based solely on the evidence adduced in court during the trial?"

---

11. The questions as proposed were:

"21. Have you seen any television coverage of this case or the events involved in this case?

22. Have you seen the Columbia Broadcasting Company (CBS) films of alleged events said to have occurred in Laurel, Maryland during the afternoon of May 15, 1972? Have you seen any other films or photographs of such alleged events? If you saw such films, do you believe what you saw in such films? What effect has viewing such films had upon you? Have they had any effect upon you?

23. Have you read any news articles, or magazine articles, or heard any radio or television news reports or other reports about this case or the alleged events claimed to be involved therein? If so, which newspapers have you read, which magazines or other publications have you read, which radio stations have you listened to and what reports or other items have you heard? Did you believe the reports or items which you heard? What effect did they have upon you? Did they have any effect upon you?"

12. The procedure followed in conducting the voir dire examination was not challenged by Bremer. See Maryland Rule 745; *Barber v. State*, 16 Md. App. 235. In a footnote in his brief he suggests that the court erred in not permitting counsel to conduct the voir dire examination. The manner of conducting the examination is discretionary in the court and we see no abuse here.

In refusing to ask proposed questions 21 and 23, the court thought they were covered by its question 10. As to proposed question 22, the court said:

"Number 22 involves a specific film — and we all recognize there was a great deal of publicity, a great many television programs that prospective jurors would see. My view in this case is that nothing has been brought to me that I think would be prejudicial in that it involved any demand for conviction, any positive statements in that connection, nor am I aware of any publicity that involved information that would not be admissible in this case as contrasted with several cases, Sheppherd versus [Maxwell], and others. . . . For that reason, I don't feel that a particular item should be pinpointed and brought out."

The purpose of the voir dire examination is to ascertain the existence of cause for disqualification and for no other purpose. *Borman v. State*, 1 Md. App. 276, 279. We said in *Phenious v. State*, 11 Md. App. 385, 389:

"In Maryland, the extent of a *voir dire* examination rests within the sound discretion of the trial judge, *Rodgers v. State*, 4 Md. App. 407, 243 A. 2d 28, *Culver v. State*, 1 Md. App. 406, 230 A. 2d 361. Maryland has no rule or statute defining the objects of inquiry in determining the eligibility of jurymen. The cases have, however, established that questions must relate to some specific issue of eligibility; those which are speculative or in the nature of a fishing expedition may be refused by the court in its discretion. *Grogg v. State*, 231 Md. 530, 191 A. 2d 435, *Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 167 A. 2d 96, *Emery v. F. P. Asher, Jr. & Sons, Inc.*, 196 Md. 1, 75 A. 2d 333. See *Whittemore v. State*, 151 Md. 309, 315, 134 A. 322. The rule applies even though it would not have been error to have asked the question. *McGee v. State*, 219 Md. 53, 146 A. 2d 194."

We find no abuse of judicial discretion in the refusal of the court below to ask the proposed questions nos. 21, 22, and 23, because we believe that the questions asked by the judge served to assure that Bremer was afforded his specific constitutional rights to trial by an "impartial jury," Amendment VI, Constitution of the United States and Article 21, Declaration of Rights, Constitution of Maryland, and "to a fair trial in a fair tribunal," which is the basic requirement of due process. *In re Murchison*, 349 U. S. 133, 136. Although the theory of the law as stated in *Reynolds v. United States*, 98 U. S. 145, 155, is that "a juror who has formed an opinion cannot be impartial," the Supreme Court revisited *Reynolds* in *Irvin v. Dowd*, 366 U. S. 717, and explained, at 722-723:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

Here we need not go as far as *Irvin* permits. It was clearly indicated through the voir dire questions put to the jury that no juror had formed an opinion, no juror had "read, seen, or heard anything" which would prevent him from rendering a fair and impartial verdict based solely on the evidence adduced in court during trial, and no juror had reason not to be able to render a fair and impartial verdict based solely on

such evidence. After performing our duty "to independently evaluate the voir dire testimony of the impaneled jurors," 366 U. S. at 723, we conclude that the trial court did not err in refusing to ask the questions as proposed.[13]

## VI

In selecting the jury Bremer was permitted four peremptory challenges as provided by Rule 746 a 2.[14] On this appeal Bremer urges that the restrictions of the Rule should not have been applied to him and argues that in any event the Rule is unconstitutional as denying him due process and equal protection of the laws. We deem the provisions of the Rule as to the number of peremptory challenges to be mandatory and not discretionary, but the short answer to Bremer's contentions is that the matters are not properly before us because they were not tried and decided below. Rule 1085. The transcript of the proceedings clearly reflects that the court expressly made known to defense counsel that four peremptory challenges were permitted Bremer and that thereafter, as a peremptory challenge was made on the part of Bremer, the court informed defense counsel of the number remaining. No objection was made to the number of peremptory challenges permitted, nor was the constitutionality of the Rule, either on its face or as applied, challenged. We shall not now consider these issues. *Gibson v. State*, 17 Md. App. 246, 252-253.

---

**13.** In *Marshall v. United States*, 360 U. S. 310, there was the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The Court said, at 312-313: "The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. . . . It may indeed be greater for it is then not tempered by protective measures." In the instant case the film specifically referred to in proposed question 22 was admitted in evidence with no objections by Bremer on the ground it was prejudicial. On appeal he claims error in the admission of the film "when its custody and processing had not been established," and it was not shown that "the entire film was present." See *infra.*

**14.** In the selection of two alternate jurors Bremer was permitted two additional peremptory challenges and the State one additional peremptory challenge for each alternate juror pursuant to Rule 748.

## VII

### (1)

Dr. William N. Fitzpatrick, a medical doctor certified by the American Board of Psychiatry and Neurology as a specialist in psychiatry, testified on behalf of the State.[15] He said he had seen Bremer on the mornings of 13 and 15 June 1972 at the Towson jail "to perform a psychiatric evaluation of him to answer the question of whether or not he was criminally responsible for certain acts which he is alleged to have committed." The examination consisted of an interview with Bremer, "direct interaction with him in terms of questioning and listening to what he had to say," as a result of which Fitzpatrick arrived at a conclusion. The transcript reads:

"Q. [by the State's Attorney]: And as a result of those interviews, sir, did you arrive upon any type of conclusion?

A. Yes.

Q. Do you have an opinion, sir, as to the sanity of Arthur Herman Bremer on May 15, 1972?

MR. LIPSITZ [Defense Counsel]: I will object to the question.

THE COURT: The question isn't put that way, Mr. Marshall.

By Mr. Marshall:

Q. Are you familiar with Article 59, Section 25 of the Annotated Code of Maryland as to the laws of criminal insanity in the State of Maryland?

---

15. Bremer had been charged also in the United States District Court for the District of Maryland, *United States of America v. Arthur Herman Bremer*, Criminal Action No. 72-0282-N. By order of that Court of 13 June 1972 upon motion by the Government and with consent of Bremer, he was examined as to his mental condition by two psychiatrists, Dr. William N. Fitzpatrick and Dr. Jonas Rappeport, to determine his competency to stand trial and whether he was "insane or otherwise mentally incompetent at the time of the alleged commission of the offenses on May 15, 1972, under the American Law Institute Test."

A. I am familiar with the test for criminal responsibility under the American Law Institute which, I believe, is applicable.

MR. LIPSITZ: I object, Your Honor, and move to strike the answer.

THE COURT: He answered what he is familiar with, but that is not the test in Maryland."

The State then asked Fitzpatrick if Bremer had a mental disorder on 15 May 1972. Over objection the witness recited the observations he made. It was his opinion that "on that day [Bremer] had the capacity, that is he did not lack capacity to realize the criminality of his behavior and to conform his conduct to the requirements of law." Asked: "Did you find any evidence whatsoever of mental disease or defect or a mental disorder?", the witness answered: "In my own terms, no." On cross-examination Fitzpatrick said that he was examining Bremer for the federal court under the American Law Institute Test and that if the test of insanity in Maryland was not the same as the A.L.I. test, he did not know what it was. Bremer moved to strike his testimony. At a bench conference the court pointed out that in the Maryland test "mental disorder" was substituted for "mental disease or defect." See *Truesdale v. State,* 16 Md. App. 260; *Young v. State,* 14 Md. App. 538; *Sherrill v. State,* 14 Md. App. 146.

By the provisions of Code, Art. 59, § 25 (a), "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of a mental disorder, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." [16] The term shall not include "an

---

16. In *Young v. State, supra,* we traced the change from "mental disease or defect" to "mental disorder," and we discussed the term "mental disorder" in the statutory meaning it then had. We held that the mental disorder test applied to all cases the trial of which began on or after 1 July 1970, the effective date of the Act making the change. By ch. 345, Acts 1972, effective 1 July 1972, the definitions of "mental disorder" and "mental illness" were amended. The practical result of the amendments was to

abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Bremer does not claim that the wrong test was applied by other psychiatrists who evaluated him and testified at his trial, but he urges that Fitzpatrick's testimony should have been stricken because he did not know what the test was. We do not believe that the denial of the motion to strike Fitzpatrick's testimony constituted reversible error in the circumstances.

Fitzpatrick said that in the context of what the term meant to him, Bremer did not suffer from a mental disorder. Bremer had opportunity on cross-examination to ascertain what "mental disorder" meant to Fitzpatrick and expressly chose not to do so. In any event, seven other psychiatrists [17] testified on the point. All of them were of the opinion that Bremer suffered from a mental disorder. Three of them said that Bremer did not lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, although one of the three, when pressed, seemed not certain. Two of them said that he did lack such capacity. Two of them were unable to give an opinion as to such capacity. Although it is true that Bremer could not be found to be insane in the contemplation of the statute if he did not suffer from a mental disorder, it is also true that he could be found sane even though he suffered from a mental disorder. We hold that the denial of the motion to strike Fitzpatrick's testimony, if error, was not so prejudicial in the circumstances as to require reversal.

(2)

Bremer charges the trial court with error in requiring Dr.

---

exclude "mental retardation" from the meaning of "mental disorder", and the test as we set it out in *Young* must be rephrased to exclude any consideration of mental retardation. By the same rationale we used in *Young*, the new test shall apply to all cases the trial of which commenced on or after 1 July 1972.

Compare the definition of "mental disorder" as it applies to "emergency admission". Code, Art. 59, § 22 (a) (4).

17. " 'Psychiatrist' shall mean any person licensed to practice medicine in the State of Maryland who devotes a substantial proportion of his time to the practice of psychiatry." Code, Art. 59, § 3 (h).

Eugene B. Brody and Dr. Sheila Hafter Gray, psychiatrists called to testify in behalf of Bremer, "to disclose communications made to them by Bremer regarding alleged events at Laurel, Maryland on May 15, 1972."

On direct examination Brody recounted the history of Bremer's life. Brody had interviewed Bremer, spoken to his father and mother, and read the psychiatric evaluation report by Jonas Rappeport, M. D., the psychological test report by James Olson, Ph.D., a report by a social worker named Mrs. Eloise Agger, a social work report based on a two-hour joint interview with Mr. and Mrs. Bremer, and Bremer's diary. He had seen the psychological report by a Doctor Stammyer. Brody described "a third acutely disturbed period" in Bremer's life, which seemed to end on or about the 1st of March when Bremer decided, he told Brody, "to assassinate either Richard Nixon or George Wallace." Brody said:

"The beginning of his diary on March the 4th was an important moment evidently because it symbolized this decision, and it apparently, that is the making of the decision, apparently had the effect of temporarily resolving some of his tension-producing conflicts, and with this decision and the beginning of action aimed at carrying out the goal, much of the tension associated with the loss of Joan seemed to have diminished for a time. So this was an act which had a function for the patient. It was a symptomatic decision."

Brody told how he followed the story in Bremer's diary, which detailed his criss-cross of the country in pursuit of President Nixon.

During the cross-examination of Brody the State asked: "In this two-hour conversation that you had with the accused, Mr. Bremer, what else did you talk about? What did you talk about? Did he tell you how he enjoyed shooting Governor Wallace?" The defense objected. At a bench conference the defense gave as the ground for his objection the unconstitutionality of Code, Art. 35, § 13A (c) (3). The

court overruled the objection because "the witness had testified as to what he used as a basis and he had even testified as to his plans for the assassination of President Nixon and Governor Wallace, and to invoke this would be to deprive the State of fair cross-examination in that area." The cross-examination of Brody continued before the jury:

"Q. In your conversations with Arthur Herman Bremer, the accused, on July 11 did he tell you about shooting Governor Wallace?

A. We didn't focus on the question of whether or not —

Q. Did he — Go ahead, Doctor.

MR. LIPSITZ: You may answer, Doctor.

THE WITNESS: We didn't focus on the question of whether or not he shot Governor Wallace. He did speak about what he might have felt during that act. For example, he had the thought that he would say, 'A penny for your thoughts,' while shooting.

By Mr. Marshall:

Q. Did he tell you that in that conversation July 11?

A. Yes, in that interview.

Q. Didn't you read that in the manuscript? Refer to your notes, Doctor.

A. You have my notes.

Q. I am sorry, Doctor. I haven't had a chance to see them before.

A. At first I read it. Of course I read it because that is —

Q. (Handing documents to the witness.)

A. I am sorry, that was in the diary, yes, sir.

Q. Now I am asking you a simple question. Did

Arthur Herman Bremer admit to you on July 11 whether or not he shot Governor Wallace on May 15, 1972?

A. He did not.

Q. He did not? You didn't even ask him that, is that correct?

A. I was not prepared to focus on that particular issue.

Q. Why not, Doctor? Isn't that important to you in the psychiatric field to find out exactly the man's emotions when he commits a criminal wrong doing?

A. He was there and he told me about being there. He told me about having the gun in his hand. He did not tell me that he had shot Governor Wallace.

Q. Why didn't you ask him that question, Doctor? What type of psychiatric examination is it that you don't ask that basic simple question?

A. I believe that I did ask that question.

Q. What did he answer?

A. I don't remember immediately what he — He answered as he always does, circumstantially and concretely."

The direct examination of Dr. Gray, after her qualifications as a psychiatrist were shown, was brief and to the point. She said she had examined Bremer twice, interviewed his father and mother, and examined various reports, documents and parts of Bremer's diary. Her opinion was that he was suffering from a mental disorder on 15 May 1972, "latent schizophrenia, which is a mental disease and disorder", and that he was insane within the meaning of the criminal responsibility statute. She said that "the acts which are alleged here are a direct product of that disease."

On cross-examination the State referred to her statement that the act Bremer was accused of committing was a direct

result of latent schizophrenia. She was asked: "In your conversations there with Mr. Bremer, you discussed this act that he is accused of, is that correct?" The defense objected on the ground that the statutory exception to the privilege of communication between patient and psychiatrist was unconstitutional. The objection was overruled at a bench conference.[18] The cross-examination of the witness resumed before the jury:

"Q. Do you remember my question, Doctor?

A. You asked whether Mr. Bremer had discussed with me the acts which are currently the subject of this trial.

Q. Yes. Did he?

A. Yes, he discussed them with me.

Q. Would you tell the ladies and gentlemen of the jury what he discussed with you? Obviously this has something to do with the formulation of your medical opinion.

\* \* \*

THE WITNESS: Yes. In response to leading questions on my part, he told me the events that had gone on in his mind and in his experience as he recalled them that led to the possible commission of these acts.

Now, I say possible commission because, very honestly, I could not determine from my interview with Mr. Bremer whether he had actually committed the acts or had simply gone to the shopping center where Governor Wallace was to

18. The State explained: "It is obvious that we are leading to the information that she has received which would lead to the eventual ultimate question as to criminal responsibility. It has to be one of formal facts." The court said: "I assume along some lines that a person who cooperates fully with one person and then refused with somebody else, there may be some significance attached to that. Very well, I will overrule the objection."

appear thinking that he might and then volunteered that he had afterward.

Now, I understand there is other evidence about whether he actually committed the acts or not, and I am not concerned with that. I am just explaining that on the basis of my examination, I was not certain. What I was certain about was that he had all of his life —

* * *

By Mr. Marshall:

Q. Did Mr. Bremer tell you that he shot Governor Wallace on May 15?

* * *

THE WITNESS: Did he come right out and say, 'I shot him'?

By Mr. Marshall:

Q. Yes. Tell me what he said? I want to know what Mr. Bremer told you, Doctor?

A. I tried to tell you, Mr. Marshall, what he told me.

Q. Tell me.

A. You didn't like that answer.

Q. Tell me. All I am asking you is whether Mr. Bremer — you know what he said to you. Do you have any notes with you, Doctor?

A. No.

Q. Are these notes at all here?

A. These are the exhibits.

Q. Did you ask him whether or not he shot Governor Wallace?

A. Outright, in that way?

Q. Yes.

A. No.

Q. What did you ask him, then?

A. I asked him to tell me about the events which were under, you know, which were under discussion.

Q. Would you tell me what he told you? Not your evaluation of what he told you, but exactly the words he used.

A. Mr. Marshall, I do not recall exactly the words he used. I have no recording of the interview. I can paraphrase what he told me to the best of my ability, if that will be satisfactory.

Q. Paraphrase it, then.

\* \* \*

THE WITNESS: The first thing that I specifically recall as having happened on May 15 was that he was going to go to a place where he understood the Governor was to be. He had in mind to assassinate him.

As I recall what the accused told me, he then noticed that he was out of gas while on a road — I have forgotten which road — got off the highway and somehow arrived at the Laurel Shopping Plaza where, to his surprise, Governor Wallace was already present at a rally. He then entered the crowd, again with the intention of shooting him.

The accused claimed to me that at a certain point he did fire the gun. I questioned him about some of the events surrounding this and I felt that he was sufficiently —

By Mr. Marshall:

Q. I am just asking you what he told you, not what

you felt. Anything else that he told you, Doctor, is all I want to know about May 15 at the Laurel Shopping Center.

A. About May 15, all right. He claims to have fired the gun.

Q. He told you that, is that correct?

A. To the best of my recollection, he claimed that he did this and then explained that some people had attempted to restrain him and his gun went off two or three more times, I forget precisely.

Q. Did he tell you who he attempted to fire this gun at on May 15 in the Laurel Shopping Center?

A. The Governor of Alabama.

Q. Governor Wallace?

A. Yes, sir."

It was brought out that Bremer had given Dr. Gray a "release", dated 1 August 1972:

"I hereby authorize Dr. Sheila H. Gray in her testimony in my behalf today to make any use she deems advisable of any information regarding me obtained from any source whatsoever and release her from any liability arising out of or in any way connected with the use thereof."

The document was signed by Bremer and witnessed by his attorney.

On redirect examination defense counsel asked Dr. Gray why she could not be certain whether Bremer committed the act he spoke to her about. She replied: "Because I can't be certain of anything that he tells me about his experience. My general medical impression of his condition was that there was a very serious blurring of the boundaries between fantasy and reality in this young man." She explained further expansively in terms of his history. There were entries in Bremer's diary which indicated a desire for

334

money. Dr. Gray was asked why Bremer had this desire. She said: "Well, I think it is part of his showing what an important person he was. Part of his motive in performing an assassination was to sell his story to Time-Life Magazines for $100,000.00. And this would show [his mother] that he was an important person who could earn $100,000.00".

In objecting to the questions directed by the State to Dr. Brody and Dr. Gray regarding what Bremer told them about the events of 15 May, defense counsel attempted to invoke the whole panoply of constitutional rights in claiming that the exception to the privileged communication statute was unconstitutional. He referred to "Article 19, 21 and 23 of the Declaration of Rights of the Constitution of Maryland and the Fifth and Sixth Amendments to the Federal Constitution, the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution," but without further specificity. We have no difficulty in determining that Code, Art. 35, § 13A (c) (3) prescribing in pertinent part that there shall be no privilege for any relevant communication between patient and psychiatrist in all proceedings, whether civil or criminal, in which the patient introduces his mental condition as an element of his claim or defense, is not unconstitutional on its face. There is no constitutional right to the privilege of communication between patient and psychiatrist. It exists by legislative grant, and ordinarily the legislature may provide the conditions under which it is applicable. *O'Brien v. State*, 126 Md. 270, 284; Rappeport, *Psychiatrist-Patient Privilege*, 23 Md. L. Rev. 39 (1963). Legislative exclusion *per se* of the privilege when a patient introduces his mental condition as an element of his claim or defense violates no constitutional guarantee. In *Robinson v. State*, 249 Md. 200, 221, the Court of Appeals stated flatly in the light of § 13A (c) (3) that a special plea of insanity makes the privilege statute inapplicable. This does not mean, however, that statements made by the patient to the psychiatrist examining him for an evaluation of his competency to stand trial or of his responsibility for criminal conduct may be used by the State

to prove that the patient committed the criminal acts charged. Code, Art. 59, subtitle, *Insanity as a Defense in Criminal Cases*, §§ 23-28, does not mention the problem.[19] The Court in *Robinson* did not find it necessary to reach the question, holding that if there was any error in the admission of the testimony there challenged, it was harmless. But at 222 it quoted *Hamilton v. State*, 225 Md. 302, 307:

> "The basic purpose of these code sections [now 23-28] is and has always been paternalistic in nature. As was said by this Court in *Deems v. State*, 127 Md. 624, 627, 96 Atl. 878 (1916), the purpose of this legislation is 'to protect an offender who is mentally incapable of forming a criminal intent from being punished as if he were sane, and to insure for him the custody and treatment best suited to his unfortunate condition.' "

It said: "What was said in *Hamilton, supra*, seems to suggest that statements made during a mental examination, 'paternalistic' in purpose, ought not be admitted into evidence." It then referred to *Ramsey v. State*, 239 Md. 561, 564-565, in which denial of due process was claimed because a State's witness, a psychiatrist, mentioned that the defendant told him that he had confessed to the commission of the offense for which he was being tried but found in the circumstances existent that the admission of the testimony, if error, was harmless.

---

**19.** In *United States v. Albright, supra*, at 725 the court said: "When an examination is conducted pursuant to 18 U.S.C.A. § 4244, the statute is quite specific that no statement made by the accused in the course of examination shall be admitted in evidence on the issue of guilt in any criminal proceeding. This is due recognition that infringement of the privilege [against self-incrimination] may result if the disclosure made by a defendant in the course of examination touching upon his guilt is used against him. Even if an examination is required, not under 18 U.S.C.A. § 4244, but under a court's inherent power to require an examination, the same recognition should be given to the privilege."

*Albright* agreed with *State v. Whitlow*, 45 N. J. 3, 210 A. 2d 763 (1965) which held that a defendant has no federal or state constitutional right to have his attorney present during a psychiatric examination conducted at the instance of the prosecutor. 388 F. 2d at 726.

We find it unnecessary to answer the question whether Code, Art. 35, § 13A (c) (3) is unconstitutional as applied to the facts in the case before us because we believe that if the admission of the challenged testimony was error it was harmless. We reach this conclusion generally in the light of the other testimony adduced by the State, clearly legally sufficient to prove the corpus delicti of each of the crimes of which Bremer was convicted and his criminal agency. We note also Bremer's diary, which he offered into evidence, and in which he told of his stalking of Governor Wallace on previous occasions. His counsel read it to the jury. Under date of 13 May 1972, two days before the actual shooting, he wrote about following Wallace to the Dearborn Youth Center. There were windows on the sides of the hall and "people at the 2 windowpanes closest to the door could, however, see all unobstructed. 'Always somewhat careless,' I thought of the S.S. The thin glass was weakly reinforced with wire mesh. But no trouble for a bullet at all. That was my plan." Bremer wrote of Wallace appearing on the podium and the enthusiastic reception he received. The manuscript continued: "He talked and talked. The ranks outside thinned. Not even many at the windows. I cursed. I wanted him to wave at us and come close as he left. He gave a couple cinema men some good 'Wallace and supporters' shots. I wanted my shot to. Did the Secret Service men really think a piece of glass was a deterent? Not to me! I was all set. Jacket opened. A still cat be for he springs. Waiting . . . Waiting . . . He's left the podium." Bremer wrote that he did not fire because two 15 year old girls got in front of him. "Their faces were 1 inch from the glass. I would shutter [shatter] with a blunt-nosed bullet. They were sew [sure] to be blinded and disfigured. I let Wallace go only to spare these 2 stupid innocent delighted kids. We pounded on the window together at the governor." Bremer read in the paper that Wallace would be in Cadillac, Michigan the next night and followed him there. He went to the rally. "I try to push the people in front of me & in my row forward or out of the way so I can get close. No lack [luck]." Near the end of the manuscript Bremer observes

that Wallace would talk at a $25 plate dinner in Kalamazoo, then at the Armory, "capacity 2,300", then "leave for Maryland tonight for 2 days of campaning.' They have a primary on the 16th too." He continued: "But I'll soon be on the front steps of the Kalamazoo Armory to welcome him. Got a sign from campaning headquarters here. To shield the go for the gun. Is there anything else to say? My cry upon firing will be, 'a penny for your thoughts.' "

As for the specific testimony of Dr. Brody, that witness said that Bremer did not say that he shot Wallace. He did tell the psychiatrist he had a gun in his hand, but that fact had previously been shown by the State from the testimony of eyewitnesses. We do not believe the admission of that testimony was error requiring reversal in the circumstances.

With respect to the specific testimony of Dr. Gray, it was largely cumulative. The State had previously adduced evidence legally sufficient to establish all that the psychiatrist said Bremer told her about the events at the Laurel Shopping Center — that he was there, that he had a gun, that he planned to shoot Wallace and that he fired the gun. And Dr. Gray made clear that she could not determine whether Bremer had done what he told her he did. But, in any event, we think that Bremer effectively waived the patient-psychiatrist privilege with respect to his communications to Dr. Gray. Under the statute it is the patient who has the privilege to refuse to disclose and to prevent a witness from disclosing, communication relating to diagnosis or treatment of a patient's mental or emotional disorder. The "release" executed by Bremer expressly permitted Dr. Gray in her testimony to use "any information regarding me obtained from any source whatsoever." If the privilege inured to Bremer, he waived it. We hold that the admission of the challenged testimony of Dr. Gray, even if error does not require reversal.

(3)

We indicated in note 15 *supra* that Bremer had also been charged in the federal court and that by order of that court

of 13 June 1972 he was to be examined by two psychiatrists, Dr. Fitzpatrick and Dr. Rappeport. The order expressly provided "that no statement made by the defendant in the course of any examination conducted pursuant to this Order shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceedings." Fitzpatrick, Rappeport, and James Eric Ollson, a doctor of philosophy in clinical psychology, testified on behalf of the State. Ollson worked for Dr. Rappeport "within the medical services of the Supreme Bench of Baltimore." Although Dr. Ollson's name was not included in the federal order, he examined Bremer at the request of Rappeport. He administered various psychological tests to Bremer [20] and interviewed him.

Bremer asserts: "The lower court erred in permitting Drs. Fitzpatrick, Rappeport and Ollson to testify below before a jury which was trying both guilt and insanity at the same time. The doctors were forbidden by the federal court order under which they examined Bremer from testifying on the issue of guilt."

In finding that the trial court did not err in refusing to strike its order for a mental examination of Bremer, we observed that we adhere to our holding that a bifurcated trial on the separate issues of insanity and guilt of the crimes charged is not constitutionally mandated. We do not believe that the witnesses were improperly permitted to testify at the trial. It was obvious that their testimony was directed to the issue of Bremer's responsibility for criminal conduct and not to the fact of the commission of the offenses charged. After the State rested insofar as the corpus delicti and criminal agency were concerned and motions for judgments of acquittal were denied, the defense adduced from Dr. Gray evidence which the court found sufficient to surmount the threshold question of sanity, ruling that her testimony raised sufficient doubt as to sanity to justify the

---

**20.** The Wechsler Adult Intelligence Scale; the Bender-Gestalt Test; a Sentence Completion Test; the Thematic Apperception Test (cards one to five); the Benton Visual Retention Test; the Minnesota Multiphasic Personality Inventory; the Rorschack Ink Blot Test; the Human Figure Drawing.

issue going to the jury. It was then the State called Ollson, Fitzpatrick and Rappeport to meet its burden of persuading the trier of fact that Bremer was sane. This was in accordance with the procedure we have enunciated, *Strawderman v. State, supra,* and we see no error. Nor do we find that a statement made by Bremer in the course of the examination of him by the three doctors was admitted against him on the issue of guilt. Ollson testified as to Bremer's general behavior when he was examined, using, at times, what Bremer said to illustrate that behavior. He then gave the results of the tests administered and interpreted them. We observe it was defense counsel on cross-examination who elicited statements made by Bremer concerning his past history. Fitzpatrick testified that he interviewed Bremer but his testimony went to the issue of sanity, not guilt. Rappeport said he interviewed Bremer on "his entire life or past history as he recalled it", and "also discussed with him all the circumstances leading up to the current offense with which he was charged." He was not asked, nor did he testify, on direct examination as to statements Bremer made to him.

We believe that the testimony of Drs. Ollson, Fitzpatrick and Rappeport may properly be deemed to have gone only to the issue of sanity *vel non.* We hold that the trial court did not err in permitting them to testify.

## VIII

At the close of the evidence and before argument of counsel, the court gave its advisory instructions to the jury. Rule 756 b and e. At the conclusion of the charge, out of the presence of the jury, defense counsel made objections. Rule 756f. On appeal Bremer urges that the trial court erred "in all respects set out in his exceptions to the court's charge," but "[h]e wishes now to emphasize several of those errors." We consider only those alleged errors concerning which he presents argument in support of his position as required by Rule 1031 c 4. *Hyde v. State,* 228 Md. 209, 218.

### (1)

The first objection considered claims an error of omission.

It was expressed below: "I object further to the charge for failure to include a specific instruction that the defendant was under no legal obligation to submit to any examination at the Clifton T. Perkins Hospital." Code, Art. 59, § 25 (b) provides that when a plea of insanity has been entered by a person the court "shall have full power and authority to order an examination of the mental condition of such person by the Department of Mental Hygiene . . . ." [21] We find it to be the clear intent of the statute that upon order of the court a defendant raising the defense of insanity is under a legal obligation to submit to an examination at the Clifton T. Perkins State Hospital. See discussion under III, *supra.* There was no error in the failure to include a specific instruction that Bremer was under no obligation to submit to any examination by the Department of Mental Hygiene.

(2)

Defense counsel objected further to the charge "for failure to give an instruction as to the consequences of a not guilty by reason of insanity verdict, that is for failure to give an advisory instruction to the effect that if the defendant is found not guilty by reason of insanity, that does not mean he walks out the door." The court said: "I have told you that you could argue that. I will not give the instruction."

A person found not guilty of any crime by reason of insanity at the time of the commission of the act may be released if warranted. Code, Art. 59, § 27 provides that such person may be committed, in the discretion of the court, to the Department of Mental Hygiene for confinement for examination and evaluation to determine, by the standards applicable to civil admission proceedings, "whether such person by reason of mental disorder would, if he becomes a free agent, be a danger to himself or to the safety of the person or property of others." Upon the basis of the report of examination and any other evidence before it, the court, again in its discretion, may direct that the person be

---

**21.** The power and authority is subject only to the provisions of § 26 of Art. 59 which deals with the time of forwarding the Department's report as to insanity.

confined for treatment. The statute contains provisions that a person so confined has the right to apply for his release. Thus a person found not guilty by reason of insanity may indeed "walk out the door." The statute comes to grips only with the problem of releasing a potentially dangerous person accused of crime when he has been acquitted by reason of insanity. *Johnson v. Perkins State Hosp.*, 257 Md. 100, 103.

In any event, the consequences of a finding of not guilty by reason of insanity should bear no part in the jury's consideration of the issue of insanity *vel non.* The jury must determine that question only on the evidence before it bearing on whether the defendant, at the time of the commission of the alleged crime, lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as a result of a mental disorder.

The court did not err in refusing an instruction as requested.

### (3)

The third objection argued in Bremer's brief was based below on the "inclusion in the charge of the mental retardation portion of the statutory definitions. There is no evidence in this case of mental retardation." The brief asserts merely that an "abstract instruction ought not to be given where it is not applicable to a particular case, *Midgett v. State*, 216 Md. 26 . . . ."

The trial court gave a comprehensive and thorough instruction, covering some ten pages in the transcript, on the Maryland test of responsibility for criminal conduct. In so doing, it patently followed the enunciation of the test as set out by us in *Young v. State, supra,* decided 2 March 1972. The test was phrased in *Young* within the context of ch. 407, Acts 1970, which substituted "mental disorder" for "mental disease or defect" and defined "mental disorder" to include "mental retardation" which was also defined. By Acts 1972, ch. 345, however, "mental retardation" was expressly excluded from the term "mental disorder", effective 1 July 1972. As Bremer's trial commenced after that date, it came

under ch. 345. See note 16 *supra.* Therefore, as to Bremer, "mental retardation" was not included in "mental disorder." Although the trial court gave the definition of mental retardation as the second reason why a person could lack the "substantial capacity" required, he immediately and clearly pointed out that it was not applicable to Bremer. The transcript reads:

"Two, a degree of subnormality of intellectual development expected to be of life duration which reduced his capability to manage himself or his affairs — which, based on the evidence in this case, would not apply because there is no evidence that there was any subnormality of intellectual development —"

Then, following defense counsel's objections, the court supplemented its charge in certain aspects. The supplementary instructions further discussed the mention of the definition of mental retardation. The court explained:

"At that point I said that this does not appear to be applicable to this case for the reason that the undisputed testimony in the case from both sides is that he had no subnormal intellectual development but in fact his intelligence quotient was higher than the average by witnesses on both sides, and I said at that time that I didn't believe this paragraph 2, a degree of subnormality of intellectual development would be involved in your consideration of this. It was suggested that you might believe when I said it didn't apply that it might apply to some earlier statement that I had made. But I mean only the paragraph that deals with the subnormality of intellect. I wanted to straighten that out."

We have no difficulty in concluding that the court made amply clear that "mental retardation" should play no part in the jury's determination of Bremer's insanity *vel non.* We hold that the error in referring to "mental retardation" in the original charge does not require reversal of the judgments.

## IX

Bremer was convicted under the 2nd and 6th counts of each of indictments 12,376; 12,377; 12,378; and 12,379. See note 1 *supra*. In each indictment the 2nd count charged the assault of a named person with intent to murder, and the 6th count charged the use of a handgun in the commission of a crime of violence. Separate sentences were imposed on each count, the sentence under the 6th count in indictment 12,376 to run consecutively to that of the 2nd count, and the sentences under the 6th count in each of the other indictments to run concurrently with the sentence under the 2nd count of the respective indictment.

Bremer now urges that the conviction under the 6th count should have merged into the conviction under the 2nd count.[22] He complains that he was twice punished for the same act.

The General Assembly of Maryland at the session held in 1972 found and declared that:

"(i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;

(iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) Further regulations on the wearing,

---

**22.** Bremer also raised the question of merger with reference to his motion to dismiss the indictments. In our discussion in II (3), *supra*, we observed that the doctrine of merger provides no basis to dismiss the counts prior to conviction.

carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens."

Upon this declaration of policy it enacted, effective the date of passage 27 March 1972, ch. 13, Acts 1972, codified as Art. 27, § 36B, laws proscribing the unlawful wearing, carrying or transporting of handguns, § 36B (b), the unlawful use of a handgun in the commission of a crime, § 36B (d), and restrictions on the reduction or suspension of mandatory minimum sentences, § 36B (e). Other sections provided for the seizure and forfeiture of handguns and ammunition, § 36C, for a search of the person for handguns under specified circumstances, § 36D, and for conditions for the issuance of a permit to carry a handgun, § 36E. Section 36F gave definitions.

Bremer was charged in the 6th count of the indictments with violation of Art. 27, § 36B (d):

"Any person who shall use a handgun in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor, be sentenced to the Maryland Division of Correction for a term of not less than five nor more than fifteen years, and it is mandatory upon the court to impose no less than the minimum sentence of five years."

Section 441 defines "crime of violence" to mean certain designated crimes and "assault with intent to commit any other offense punishable by imprisonment for more than one year." Assault with intent to murder is a felony and the maximum sentence authorized is 15 years. Code, Art. 27, § 12.

The legislative intent is pellucid. A person using a handgun as proscribed "shall be guilty of a separate misdemeanor" and upon conviction, "shall, in addition to

any other sentence imposed by virtue of the commission of said felony or misdemeanor," receive a separate sentence of no less than the minimum of five years. The statute patently precludes the application of the doctrine of merger. We so hold.

X

Bremer entitles his last contention: "The lower court also erred in rulings on evidence and in other respects." As the title suggests, the contention is a scatter shot listing of alleged errors, bald statements in the main, without supporting argument as required by Rule 1031 c 4.

(1)

"The lower court erred in admitting the Laurence Pierce CBS news film when its custody and processing had not been established and the witness Pierce was unable to say that the entire film was present."

Pierce testified that he filmed the events at Laurel on 15 May 1972. He delivered the film to the CBS people at the studio, 2020 N. Street, Washington, D. C. He was asked: "Could you tell us at the present time whether this film you have reasonably and accurately depicts the scene as it existed on May 15, 1972, at approximately 4:00 P.M. at the Laurel Shopping Center?" He replied: "The only way I can identify this film is by viewing it visually and audibly. If the Court will provide me with that means of viewing it, I will be glad to say whether it represents the scene as it was that day in Laurel." The court thought "it would be admitted subject to the witness's positive identification or at the time it is projected. He said he can't until then. So it is subject to a motion, Mr. Lipsitz, to strike it if the witness cannot identify it after it is projected." Defense counsel requested and was permitted to cross-examine the witness before the film was admitted. At the conclusion of the cross-examination defense counsel renewed his objection to its admission and the objection was overruled, "subject to the condition that after it is projected, if it isn't the one the witness can say so. If he believes it is the one that he took

and what he testifies to applies to that, then it would be admissible in evidence." The film was projected. Pierce said it fairly and accurately represented the scene at the Laurel Shopping Center in Prince George's County on May 15, 1972 at approximately 4:00 P.M. To the best of his knowledge the film shown was the entire roll.

We hold there was no error in the admission of the film. *Carroll v. State*, 11 Md. App. 412, 414.

(2)

"The lower court also erred, after the witness Pierce had departed and without having him or anyone else lay any proper foundation, in permitting the State to display enlarged prints of various frames from the film to several witnesses, in allowing them to describe and characterize the contents of the prints and in admitting the prints in evidence." He refers to three witnesses to whom the prints were displayed, "Mrs. Speigel," "Corporal Landrum," and "Agent Zarvos."

Mrs. Mabel Kathleen Speigel identified herself, her husband, her mother and the accused in the picture shown her. She said it fairly and accurately represented the scene as she recalled it at approximately 4:00 P.M., 15 May 1972.

Corporal Michael M. Landrum of the Prince George's County Police Department described the shootings as he observed them and the events immediately preceding and following. The State showed him a photograph and asked if he could identify it. Landrum said he believed it was the same photograph he saw in Life Magazine. He said: "This is a photograph that was taken after the shooting and before we placed him [Bremer] in a police car and took him to Hyattsville Substation. It is a period of approximately, I would estimate, three or four minutes before we got him into the cruiser. It was taken during that time, but I don't know when." He identified persons depicted in the photograph by name.

Agent Nichols J. Zarvos, Special Agent, United States Secret Service was shown a photograph and asked if he could identify it. He said: "Governor Wallace in the middle;

Special Agent George Taylor, who was head of the detail, to his right; and myself to his left there. . . This was a picture taken while we were at the Laurel Shopping Center on May 15 when the Governor was going through shaking hands with the crowd after he had concluded his speech." Zarvos was shown a second photograph which he identified: "This is Governor Wallace shaking hands with the crowd, Mr. Taylor on his right, and I am behind the Governor looking to the left. This would have been just prior to the gunshots." He said a third photograph depicted "Governor Wallace and Mr. Taylor to his right and I am right behind the Governor slightly to his left there. Again, the position I had just before the gunshots."

All the photographs were admitted over objection. The admissibility of photographs as evidence is within the discretion of the trial court. We see no abuse of discretion here. *Crenshaw v. State,* 13 Md. App. 361, 371-372; *Bromwell v. State,* 8 Md. App. 382, 385-386. See *McLaughlin v. State,* 3 Md. App. 515; *Culver v. State,* 1 Md. App. 406.

(3)

"The lower court erred in permitting the witness Crowley, called by the State in rebuttal, to testify in the face of Bremer's assertion of his privilege to prevent him from disclosing communications made by him to Bremer under the patient-psychiatrist relationship."

Brian Crowley, a psychiatrist connected with the Potomac Foundation for Mental Health was called by the State in rebuttal and asked if he had examined Bremer. Defense counsel objected. "I say again the defendant asserts his privilege to prevent this witness from testifying and asks the Court to rule on it." The court overruled the objection as under the exception prescribed in Art. 35, Section 13A (c) (3). The court's ruling was proper. See discussion in VII (2) *supra.*[23]

---

**23.** On direct examination Crowley said that Bremer had a mental disorder but did not, as a result thereof, lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law on 15 May 1972. On cross-examination the defense introduced a letter from Crowley to defense counsel dated 31 July 1972 in

(4)

"The court erred also in permitting the witnesses Freinek, Adamo and Mackay, or some of them, to give opinions based in part on evidence adduced in the case when those witnesses acknowledged that they were not present during delivery of all the evidence. The court erred further in permitting those witnesses to give any opinions at all with respect to Bremer's mental status or condition when each of them acknowledged that he had made no mental examination of Bremer."

It appears from the transcript of the proceedings that of the three only Dr. Ian Mackay, a psychiatrist on the staff of the Clifton T. Perkins State Hospital gave an opinion on Bremer's sanity at the time of the commission of the offense alleged. Dr. Mackay recounted in detail his contacts with Bremer and the materials available to him in consideration of Bremer's sanity. He said:

"I personally read and heard Dr. James Olsson of the Medical Branch of the Supreme Bench of Baltimore City's report on Tuesday afternoon, I believe, and I heard Dr. Stammeyer's psychological report yesterday, I think it was — it must have been yesterday; couldn't have been Tuesday — and also read fully both Dr. Rappeport's, Jonas Rappeport's report, and Dr. — is it James? — Fitzpatrick, his report, both members, as his Honor and the ladies and gentlemen of the jury know, members of the Medical Branch of the Supreme Bench of Baltimore City. And I also heard Dr. Brody's scholarly presentation yesterday morning, which was most impressive, and Dr. Sheila Gray's testimony I heard. And as I think I have mentioned, the F.B.I. Reports, and I also heard yesterday

---

which Crowley said he did not know whether Bremer lacked or possessed such capacity. He subsequently said: "It is not my opinion that he lacks substantial capacity. It is my opinion that most probably he possessed substantial capacity. I am not certain. I don't see how anyone can be certain. At least I can't."

before I left here at 5:25, I heard the report that — I
forget, I don't know her name, the social worker
who worked with Dr. Gray — Agger, or someone. I
forget her name."

He had observed Bremer in the courtroom from time to time
during the preceding three days. We do not think the
admission of his opinion was an abuse of judicial discretion.
See *Tull v. State*, 230 Md. 596, 603; *Queen v. Director*, 226 Md.
664, 665; *Rickards v. State*, 129 Md. 184, 190. See also
*Baber v. Knipp & Sons*, 164 Md. 55, 61; *Damm v. State*, 128
Md. 665, 673-674; *Davis v. State*, 38 Md. 15, 37-38.

(5)

"Bremer also asserts that the Maryland requirement that
the jury be the judge of the law as well as the facts in a
criminal cause [24] is invalid, was peculiarly harmful to him in
the circumstances of the instant cases, where complex issues
regarding criminal responsibility, as well as guilt or
innocence are involved, and denied him due process of law."

As Bremer points out in his brief, no objection was made
to the trial court's instruction to the jury that " . . . under
the Constitution of Maryland the jury are the judges of both
the law and the facts, so that anything the Court may say
concerning either the law or the facts in the case may be
taken only as advisory and is not binding upon you because
you have that sole prerogative in a criminal case both as to
law and facts. You determine the law as you believe it to be
— not as you think it should be or you would like it to be —
and apply that to the facts as you find the facts to be."
Therefore, he may not assign the alleged error as of right.
Rule 756 g. In any event, the instruction was proper. We said
in *Wilkins v. State*, 16 Md. App. 587, 604-605:

"The constitutionality of Article XV, Section 5 has
been repeatedly upheld by the Court of Appeals and
by this Court. *Slansky v. State*, 192 Md. 94,
63 A. 2d 599 (1949); *Giles v. State*, 229 Md. 370, 183

24. Constitution of Maryland, Article XV, § 5; Code, Art. 27, § 593; Rule
756 b.

A. 2d 359 (1962); *Avey v. State,* 1 Md. App. 178, 228 A. 2d 614 (1967); *Lewis v. State,* 2 Md. App. 678, 237 A. 2d 73 (1968); *Avey v. State,* 9 Md. App. 227, 263 A. 2d 609 (1970). Moreover, the Supreme Court of the United States has had occasion to consider Article XV, Section 5, but has failed to intimate doubts about the constitutionality of the provision. In *Giles v. Maryland,* 372 U. S. 767 (1963), the Supreme Court dismissed an appeal which raised this issue, along with others, for want of a substantial federal question. See also *Brady v. Maryland,* 373 U. S. 83 (1963), in which the Court discussed Article XV, Section 5 without questioning its constitutionality.

The whole question was carefully addressed by the Fourth Circuit, speaking through Judge Sobeloff, in *Wyley v. Warden,* 372 F. 2d 742, 744 (4th Cir. 1967). In that case, the Fourth Circuit rejected Wyley's challenge to Article XV, Section 5, based upon a claim that the provision denied him due process and equal protection of the law in violation of the Fourteenth Amendment."

(6)

"Bremer says also that the lower court erred further on his motion for a new trial in rejecting his proffer to prove by the trial jurors and by the proposed witness Day that the jurors had indeed viewed the Laurence Pierce CBS film of events at Laurel prior to coming to court (and that the lower court abused its discretion in denying the motion)."

Bremer filed a "Motion for a New Trial and/or in Arrest of Judgment" on 8 August 1972. Rule 759; Rule 567; Rule 8; Code, Art. 27, § 594. The eighth reason set out in the motion was: "Because at least one member of the jury, prior to trial and prior to being sworn as a juror, viewed on television, outside the Courtroom, the CBS news film identified by the witness Pierce and thereafter admitted in evidence . . . ." At the hearing on the motion defense counsel said that in support of the eighth reason he "would like to call . . . the members of the petit jury." He made a proffer to prove by

the jurors that at least one of them and probably more had viewed the film before the trial. The court asked if he had information to that effect. Counsel replied:

"Yes, Your Honor. I have a witness summonsed here, Mr. Day, from the Evening Sun who will testify also that he interviewed Mr. Telli subsequent to the trial and that Mr. Telli stated to him, Mr. Day, that he, Mr. Telli, had viewed the CBS film introduced through the Witness Pierce several times, I think two or three times, prior to coming to Court.

I think the same situation will apply to others of the members of the petit jury. And it is for that reason that I have summonsed the jurors here today. It is for that reason I included, in my motion, paragraph 8. And my proffer is to establish by the jurors and if necessary by the Witness Day that jurors viewed this piece of evidence prior to being summonsed in as veniremen."

The court denied the motion for a new trial as to that ground. It thought that the voir dire examination of the jurors had adequately protected Bremer. See discussion under V *supra*. We observe that the film in question was not evidence that some jurors had seen and other jurors had not seen. It was viewed by all the jurors at the trial. Even if some of the jurors had seen the film, as it may have been available to the public at large prior to the trial, in the light of the indication by each of them that he had not "read, seen, or heard anything about this case which would prevent [him] from rendering a fair and impartial verdict based solely on the evidence adduced in court during trial" and that there was no reason why he "would not be able to render a fair and impartial verdict in these cases based solely on the evidence adduced in court during the trial", and that he had not expressed or formed any opinion as to the guilt or innocence or as to the sanity or insanity of Bremer, we do not believe a prior viewing *per se* derogated from the fairness of the trial or the impartiality of the jury.

The Court of Appeals has recently reaffirmed, in sure and certain language, the established principle that generally the ruling of the trial court on a motion for a new trial in a criminal case lies within the sound discretion of the trial court and cannot be reviewed on appeal, except, perhaps, when the judicial discretion is clearly abused. *State v. Devers*, 260 Md. 360, 373-381.[25] We see no clear abuse of discretion here to place the denial of the motion within the exception. We hold the trial court did not err in denying the motion for a new trial.

*Judgments affirmed; appellant to pay costs.*

---

**25.** There is intimation in *Devers* that "the denial of a new trial where the motion is grounded on newly discovered evidence may well be just such a clear abuse of discretion as will make the denial reviewable." *Id.*, at 376. And it noted that a new trial may be granted at the instance of a defendant in a criminal case where the verdict is contrary to law. *Id.*, at 381.